1  TIMOTHY J. YOO (State Bar No. 155531)
   DAVID B. GOLUBCHIK (State Bar No. 185520)
2  JULIET Y. OH (State Bar No. 211414)
   LEVENE, NEALE, BENDER, RANKIN & BRILL L.L.P.
3  10250 Constellation Boulevard, Suite 1700
   Los Angeles, California 90067
4  Telephone:  (310) 229-1234
   Facsimile:  (310) 229-1244
5  Emails: tjy@lnbrb.com; dbg@lnbrb.com; jyo@lnbrb.com
6
7  Proposed Attorneys for Debtor and Debtor in Possession

8              **UNITED STATES BANKRUPTCY COURT**

9              **CENTRAL DISTRICT OF CALIFORNIA**

10                  **LOS ANGELES DIVISION**

11 In re:                                    ) Case No.: 2:10-bk-31833-BR
                                             )
12   HARVARD GRAND INVESTMENT,               ) Chapter 11 Case
     INC.,                                   )
13                                           ) **NOTICE OF SUBMISSION OF <u>ASSET</u>**
              Debtor and Debtor in Possession, ) **<u>PURCHASE</u>   <u>AGREEMENT</u>   RE:**
14                                           ) **MOTION FOR ENTRY OF AN ORDER:**
                                             ) **(A) APPROVING COMPROMISE OF**
15                                           ) **CONTROVERSY BETWEEN DEBTOR**
                                             ) **AND   SECURED   CREDITOR;   (B)**
16                                           ) **AUTHORIZING   THE   SALE   OF**
                                             ) **SUBSTANTIALLY   ALL   OF   THE**
17                                           ) **DEBTOR'S   ASSETS   FREE   AND**
                                             ) **CLEAR   OF   LIENS,   CLAIMS,**
18                                           ) **ENCUMBRANCES AND INTERESTS;**
                                             ) **(C)   AUTHORIZING   THE**
19                                           ) **ASSUMPTION AND ASSIGNMENT OF**
                                             ) **CERTAIN EXECUTORY CONTRACTS**
20                                           ) **AND UNEXPIRED LEASES; AND (D)**
                                             ) **GRANTING RELATED RELIEF**
21                                           )
                                             )
22                                           )
                                             )
23                                           )
                                             ) <u>Hearing:</u>
24                                           ) Date:   June 22, 2010
                                             ) Time:   10:00 a.m.
25                                           ) Place:   255 East Temple Street
                                             )             Courtroom 1668
26 ——————————————————————————— ) Los Angeles, CA 90012
27
28

1   **PLEASE TAKE NOTICE** that, attached hereto as exhibit "1", is a copy if the form

2   Asset Purchase Agreement with respect to the subject transaction.

3   Dated: June 21, 2010                    HARVARD GRAND INVESTMENT, INC.

4

5                                           By:  /s/ David B. Golubchik
                                                 DAVID B. GOLUBCHIK
6                                                LEVENE, NEALE, BENDER, RANKIN
                                                  & BRILL L.L.P.
7                                                Proposed Attorneys for Debtor and
                                                 Debtor in Possession
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 1

## ASSET PURCHASE AGREEMENT

**by and between**

**Carson Hotel, LLC,**

**as Purchaser,**

**and**

**Harvard Grand Investment, Inc.**

**as Seller and Chapter 11 debtor in possession**

# Table of Contents

Page

1.     Transfer of Assets. ...................................................................................................................2

    1.1     Purchase and Sale of Assets ......................................................................................2
    1.2     Excluded Assets ........................................................................................................3
    1.3     Executory Contracts...................................................................................................4

2.     Consideration. .........................................................................................................................4

    2.1     Purchase Price ...........................................................................................................4
    2.2     Assumed Liabilities ...................................................................................................5
    2.3     Excluded Liabilities ...................................................................................................5
    2.4     Payment of Cure Amounts ........................................................................................5
    2.5     Apportionment ..........................................................................................................5
    2.6     Purchase Price Allocation .........................................................................................6
    2.7     Payment and Adjustment of Cash Purchase Price ........... **Error! Bookmark not defined.**

3.     Closing Transactions. ..............................................................................................................6

    3.1     Closing...................................................................... ......................................6
    3.2     Seller's Deliveries to Purchaser at Closing ...............................................................6
    3.3     Purchaser's Deliveries to Seller at Closing ...............................................................7
    3.4     Sales, Use and Other Taxes.......................................................................................8
    3.5     Possession .................................................................................................................9
    3.6     Closing Date ..............................................................................................................9

4.     Conditions Precedent to Closing..............................................................................................9

    4.1     Conditions to Seller's Obligations.............................................................................9
    4.2     Conditions to Purchaser's Obligations.....................................................................10

5.     Seller's Representations and Warranties. ...............................................................................10

    5.1     Organization.............................................................................................................10
    5.2     Validity and Enforceability ......................................................................................11
    5.3     Approvals and Consents ..........................................................................................11
    5.4     No Conflict...............................................................................................................11
    5.5     Litigation..................................................................................................................11
    5.6     Compliance with Laws ............................................................................................11
    5.7     Financial Statements.................................................................................................11
    5.8     Absence of the Material Adverse Changes and Undisclosed Liabilities ......................12
    5.9     Title to and Use of Property .....................................................................................12
    5.10     Assets Necessary to Continue to Conduct Business ..................................................12
    5.11     Real Property............................................................................................................12
    5.12     Other Personal Property............................................................................................13
    5.13     Intellectual Property..................................................................................................13
    5.14     Contracts. .................................................................................................................13

5.15    Business Permits...................................................................................................14
5.16    Employees and Labor Relations...........................................................................14
5.17    ERISA; Seller Benefit Plans. ...............................................................................14
5.18    Environmental Matters .........................................................................................16
5.19    Insurance ..............................................................................................................16
5.20    Transactions with Related Parties.........................................................................16
5.21    Complete Copies of Materials ..............................................................................17
5.22    Broker's or Finder's Fees......................................................................................17
5.23    Liabilities Under Purchased Contracts..................................................................17
5.24    No Management Agreement ..................................................................................17

6.    Purchaser's Warranties and Representations. .................................................................17

6.1    Organization .........................................................................................................17
6.2    Validity and Enforceability ..................................................................................17
6.3    No Conflict............................................................................................................17
6.4    Financial Resources ..............................................................................................17
6.5    Broker's or Finder's Fees......................................................................................17

7.    "AS IS" Transaction.......................................................................................................17

8.    Bankruptcy Court Approvals .........................................................................................18

9.    Commercially Reasonable Efforts. .................................................................................18

10.    Conduct Pending Closing. ..............................................................................................18

11.    Employee Matters. ..........................................................................................................21

12.    Termination. ...................................................................................................................22

12.1    Termination by Mutual Consent............................................................................22
12.2    Termination by Either Purchaser or Seller............................................................22
12.3    Termination by Seller ...........................................................................................22
12.4    Termination by Purchaser .....................................................................................22
12.5    Effect of Termination ...........................................................................................23
12.6    Notification of Certain Events...............................................................................23

13.    Post-Closing Matters ......................................................................................................24

13.2    Reasonable Access to Records and Certain Personnel ...........................................24
13.3    Use of Intellectual Property ..................................................................................24
13.4    Brokerage Obligations ..........................................................................................24

14.    Miscellaneous. ...................................................................................24

    14.1    Attorneys' Fees..........................................................................24
    14.2    Notices ....................................................................................24
    14.3    Entire Agreement.......................................................................26
    14.4    Modification .............................................................................26
    14.5    Severability ..............................................................................26
    14.6    Captions ..................................................................................26
    14.7    Further Assurances .....................................................................26
    14.8    Waiver.....................................................................................26
    14.9    Payment of Fees and Expenses .....................................................26
    14.10   Survival...................................................................................26
    14.11   Assignments .............................................................................26
    14.12   Binding Effect ...........................................................................27
    14.13   Applicable Law .........................................................................27
    14.14   Construction .............................................................................27
    14.15   CONSENT TO JURISDICTION ...................................................27
    14.16   Counterparts .............................................................................27
    14.17   Non-Recourse............................................................................27
    14.18   Time is of the Essence .................................................................27
    14.19   Interpretation and Rules of Construction .........................................28
    14.20   Third Party Beneficiaries .............................................................28
    14.21   Headings ..................................................................................28

15.    Definitions .....................................................................................28

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (the "*Agreement*") is made and entered into as of June 21, 2010 (the "*Effective Date*") by and between Carson Hotel, LLC, a Delaware limited liability company ("*Purchaser*"), and Harvard Grand Investment, Inc., a California corporation, as Chapter 11 debtor in possession ("*Seller*").    In this Agreement, Seller and Purchaser are collectively referred to as the "*Parties*."

## RECITALS

The Parties hereby acknowledge that:

A.      Seller is engaged in the ownership and operation of the Doubletree Hotel Carson Civic Plaza, a full service hotel located at 2 Civic Plaza, Carson, California (such hotel, the "*Hotel*" and such business, the "*Business*").

B.      Seller is the maker of a Promissory Note dated on or about September 26, 2007 in the original principal amount of $22,260,000 (the "*Note*") in favor of Shinhan Bank America, for itself and as agent for the lenders identified therein (the "*Bank*").  The Note was issued pursuant to a Business Loan Agreement on or about September 26, 2007 between Seller, as borrower, and the Bank (as amended, the "*Loan Agreement*").  The obligations of Seller under the Note and the Loan Agreement are secured by a security interest in all of the assets of Seller pursuant to a Commercial Security Agreement dated on or about September 26, 2007 between Seller, as debtor, and the Bank, as secured party (the "*Security Agreement*" and, together with the Note and the Loan Agreement, the "*Loan Documents*"), and a deed of trust on the real property underlying the Hotel, recorded in the property records of the County of Los Angeles as document number 20072238021 (the "*Deed of Trust*").  Seller is in default under the Loan Documents as of the date hereof.

C.      On May 27, 2010 (the "*Petition Date*"), Seller filed a voluntary petition (the "*Petition*") for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. Sections 101 et seq. (the "*Bankruptcy Code*") in the United States Bankruptcy Court for the Central District of California Los Angeles Division (the "*Bankruptcy Court*"), commencing a federal bankruptcy case in respect of Seller (collectively, the "*Chapter 11 Case*").

D.      Purchaser has acquired from the Bank, and currently is the holder of, all right, title and interest of the Bank in and to the Loan Documents and the Deed of Trust.

E.      On the terms and conditions of this Agreement, and pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, Seller wishes to sell or cause to be sold to Purchaser, and Purchaser wishes to purchase from Seller, certain of the assets and properties of Seller relating to the Business (including the Hotel), and the assumption and assignment of certain executory contracts and unexpired leases pursuant to the terms hereof, all in the manner and subject to the terms and conditions set forth herein and in accordance with Sections 105, 363 and 365 of the Bankruptcy Code (such transactions, the "*Contemplated Transactions*").

## AGREEMENT

In consideration of their respective covenants set forth herein, the Parties agree as follows:

1.    Transfer of Assets.

1.1    Purchase and Sale of Assets.    On the Closing Date and on the terms and conditions hereinafter set forth, Seller shall sell, assign, transfer, convey and deliver to Purchaser, and Purchaser shall purchase, acquire, accept and receive from Seller, free and clear of all Encumbrances (excluding any real property taxes, easements and Assumed Liabilities), all of Seller's right, title and interest as of the Closing Date in and to all of Seller's assets and properties, other than any Excluded Assets (such assets and properties other than Excluded Assets, the "*Purchased Assets*"), including but not limited to:

(a)    Seller's fee title interest in and to the land on which the Hotel is located and any adjacent parcels, as well as all related improvements and fixtures (the "*Purchased Real Property*"), as set forth on Exhibit "G" attached hereto;

(b)    all Furniture and Equipment and motor vehicles of Seller, including but not limited to the Furniture and Equipment identified on Schedule 5.12(a), to the extent located at the Hotel as of the Closing Date (the "*Purchased Furniture and Equipment*");

(c)    all Inventory of Seller, including but not limited to that identified on Schedule 5.12(a), to the extent located at (or in transit to) the Hotel as of the Closing Date (the "*Purchased Inventory*");

(d)    all security, escrow, customer, guest, utility and other deposits, credits, prepaid expenses, deferred charges, advance payments and prepaid items and duties, including but not limited to the items identified on Schedule 5.12(b) (collectively, the "*Deposits*"), subject, in the case of any Deposit that is the subject of a Contract, to the right of Purchaser under Section 1.3 to designate, in its sole and absolute discretion, any such Contract as an Excluded Contract (in which case any such Deposit shall be deemed an Excluded Asset);

(e)    all Intangible Property Assets;

(f)    any interest of Seller (i) as lessee or licensee of equipment or other personal property, tangible or intangible, under a Seller's Contract that is a Personal Property Lease described on Schedule 5.14(a) and (ii) under any Seller's Contract (not a Personal Property Lease) described on Schedule 5.14(b), subject to the right of Purchaser under Section 1.3 to designate, in its sole and absolute discretion, any such Contract as an Excluded Contract, in which case any such interest of Seller shall be deemed an Excluded Asset (all such Seller's Contracts not so designated, the "*Purchased Contracts*");

(g)    all accounts receivable and notes receivable (whether current or non-current), and all causes of action specifically pertaining to the collection of the foregoing (collectively, the "*Receivables*"), subject, in the case of any Receivable that arises out of a Contract, to the rights of Purchaser under Section 1.3 to designate, in its sole and absolute discretion, any such Contract as an Excluded Contract, in which case any such Receivable shall be deemed an Excluded Asset (provided that the outstanding loans made by Seller to Chang Hun (James) Lee and his affiliates and related persons shall  be considered a Receivable  being

transferred to Purchaser pursuant to this Agreement and, concurrently with the transfer, being released, forgiven and deemed satisfied for all purposes by Purchaser);

        (h)    to the extent transferable and assignable, all of the Seller's interest in all Business Permits, including, without limitation, those described on Schedule 5.15 (collectively, the "*Business Permits*");

        (i)    all Claims of Seller that are not Excluded Assets, including but not limited to any such Claims for (a) any refunds, rebates or credits of or with respect to any Taxes paid by or on behalf of Seller, (b) for proceeds under insurance policies relating to the assets, properties, business or operations of Seller, and (c) any promotional allowances or vendor rebates and similar items related to the Business;

        (j)    all rights of Seller to take delivery of all merchandise ordered by Seller before the Closing Date for delivery to the Hotel, which merchandise has not been delivered as of the Closing Date, to the extent the purchase orders for such merchandise are Assumed Liabilities; and

        (k)    all cash and cash equivalents (including but not limited to operating account balances at banks and other financial institutions, certificates of deposit and other time deposits and petty cash) and marketable securities, wherever located, other than any Deposits.

    1.2    Excluded Assets. The Purchased Assets shall exclude any right, title or interest of Seller in or to all of the following (collectively, the "*Excluded Assets*"):

        (a)    Intentionally Omitted;

        (b)    any Deposits set aside for payroll and sales tax or retainers set aside for professionals of Seller (notwithstanding Section 1.1(d);

        (c)    the Purchase Price and Seller's rights under this Agreement;

        (d)    the Excluded Contracts, including any refund, credit or payment due to Seller thereunder;

        (e)    any Inventory of Seller that is not located at (or in transit to) the Hotel as of the Closing Date;

        (f)    all Furniture and Equipment of Seller other than Purchased Furniture and Equipment;

        (g)    all Claims (A) for Avoidance Actions, or (B) arising under any Excluded Contract or relating exclusively to any Excluded Asset;

        (h)    all books and records relating to any pre-Closing Period that the Seller is required by law to retain, including, without limitation, (i) Tax Returns, financial statements, and corporate or other entity filings (*provided, however*, that Purchaser shall have the right to make copies of any portions of such retained books and records that relate to the Business or any of the Purchased Assets), (ii) minute books, stock ledgers, and stock certificates of Seller or of any Subsidiaries of Seller, and (iii) documents relating to proposals to acquire the Business by Persons other than Purchaser;

(i)    all securities, whether capital stock or debt, and other ownership interests issued by Seller;

(j)    all assets of any Section 401(k) or other employee pension or benefit plan;

(k)    all work histories, personnel and medical records of employees and former employees of Seller who worked at any time for any reason at the Business for whom a record exists at the Business at the time of Closing; *provided, however*, so far as legally permissible under applicable data protection, medical confidentiality or similar laws:   the Management Company (as defined in <u>Section 11</u> below) will be provided the originals of all personnel and medical records of employees of Seller who have accepted employment with the Management Company in connection with the sale hereunder,  with the prior written consent of such employee or after posted written notice or other appropriate notice to such employees if legally required.   If an employee objects to provision of personnel or medical records to the Management Company, the records will not be provided; and

(l)    any item expressly excluded pursuant to the provisions of <u>Section 1.1</u> above.

1.3    <u>Executory Contracts.</u>

(a)    On or prior to June 21, 2010, Purchaser shall have the right, in Purchaser's sole and absolute discretion, to designate any Seller's Contract as an Excluded Contract. Any Seller's Contract designated as an Excluded Contract may be assumed or rejected by Seller in Seller's sole discretion and shall be deemed an Excluded Asset.   Any such designation may be made by Purchaser by giving notice thereof in accordance with <u>Section 14.2</u> on or prior to June 21, 2010. All such designations made by Purchaser shall be become final and binding upon Purchaser and, except as otherwise set forth below, all Seller's Contracts as to which Purchaser has made no such designation shall be deemed Purchased Contracts.

(b)    As part of the Sale Motion, Seller shall seek approval by the Bankruptcy Court of the sale, assumption and assignment by Seller to Purchaser of all Contracts identified on Schedules <u>5.14(a)</u>, and <u>5.14(b)</u>. Seller shall serve the Sale Motion on all counterparties to all such Seller's Contracts along with a notice specifically stating that Seller is or may be seeking the sale, assumption and assignment of such Seller's Contracts and shall notify such parties of the deadline for objecting to the Cure Costs listed in <u>Schedule 5.14(c)</u>, which deadline shall be not less than three (3) calendar days prior to the hearing to approve the Sale Motion.   As part of the Sale Motion, Seller shall seek authority to file with the Bankruptcy Court the list identifying such Seller's Contracts and the amounts necessary to cure defaults under each of such Contract as determined by Seller in accordance with <u>Schedule 5.14(c)</u>, so as to enable any such party to object to the proposed Cure Costs and the Bankruptcy Court to determine such Cure Costs as promptly as reasonably possible.   In cases in which Seller is unable to establish that a default exists, the relevant Cure Cost shall be set at $0.00.

2.    <u>Consideration.</u>

2.1    <u>Purchase Price.</u>   The consideration to be delivered by Purchaser for the Purchased Assets (the "***Purchase Price***") shall consist of (a) the amount of all secured claims against the Seller held by Purchaser (whether for principal, interest, penalties, expenses, deficiencies or otherwise) arising under the Loan Documents and the Deed of Trust, and resulting in the satisfaction of all such

claims; (b) the assumption of Assumed Liabilities; and (c) cash in an amount equal to $534,932.94, which amount the Parties have determined equals the aggregate amount of all scheduled priority and general unsecured claims (other than the Hilton Claim) plus $50,000, against the Company that are not included among the Assumed Liabilities (collectively, the "*Claim Reserve*"), to be held in the Unsecured Claims Account in accord with Section 3.3(b) (calculated as set forth on Schedule 2.1).

     2.2    Assumed Liabilities. The following shall constitute "Assumed Liabilities" of Seller: (a) only those Liabilities of Seller for Utilities and Apportionable Operating Expenses, to the extent (and only to the extent) such items are required under Section 2.5 to be borne by Purchaser; (b) Seller's obligations under the Purchased Contracts and Seller's obligations to be performed under Business Permits included in the Purchased Assets that are assigned or otherwise transferred to Purchaser pursuant to this Agreement and listed on Schedule 5.15; (c ) the obligation to pay for assets, goods or services ordered by Seller in the ordinary course of business on or prior to Closing and included in the Purchased Assets (it being understood that Purchaser shall have no obligation to accept assets, goods or services for which Seller was not obligated); (d) secured claims encumbering Seller's motor vehicles in the amount of $10,000; (e) Seller's indebtedness to Hilton Hotel Corporation for all accrued and outstanding royalties, fees and other amounts due and owing by Seller to Hilton, claimed by Hilton to be an amount equal to $183,878.67; and (e) those Liabilities identified on Schedule 2.2 attached hereto, to the extent not paid by Seller from cash prior to Closing or included in Deposits which are Excluded Assets pursuant to Section 1.1 (b).

     2.3    Excluded Liabilities. Notwithstanding anything to the contrary contained in this Agreement, Purchaser shall not be obligated to assume or to perform or discharge any Liability of Seller or its Affiliates other than the Assumed Liabilities (such Liabilities not assumed by Purchaser, the "*Excluded Liabilities*"). Without limiting the foregoing, Purchaser shall not be obligated to assume or to perform or discharge, and does not assume or perform or discharge, any of the following Liabilities: (i) any Liability of Seller or its Affiliates that arises on or before the Closing Date and is not specifically assumed by Purchaser; (ii) any Liability of Seller or its Affiliates relating to any Excluded Contracts or other Seller's Contracts which is not a Purchased Contract (including without limitation, any possible Cure Costs relating thereto); (iii) any Liability of Seller or its Affiliates relating to any of the Excluded Assets; (iv) any Liability of Seller or its Affiliates relating to Seller's execution, delivery or performance of this Agreement or any document contemplated by this Agreement; (v) any and all Liabilities of Seller or its Affiliates of any sort whatsoever (whether now existing or hereafter arising) under Environmental Laws relating to or arising out of or in connection with the Business or the Hotel (including, without limitation, administrative or civil fines or penalties for violations of Environmental Laws, or remediation or response costs for contamination); (vi) any brokerage fees of Seller; (vii) any Liability of Seller or its Affiliates with respect to the WARN Act, or any similar federal, state or other law, rule or regulation; (viii) any Liability of Seller or its Affiliates to employees; (ix) any compensation and reimbursement of expenses of Seller or its Affiliates to Seller's legal counsel and other advisors; and (x) any accrued but unpaid sales tax as of the Closing Date arising from the sales of Inventory in the ordinary course of business.

     2.4    Payment of Cure Amounts. All Cure Costs under Purchased Contracts shall be the responsibility of Purchaser. Cure Costs under any Purchased Contract shall be paid promptly to the parties to whom and pursuant to the terms by which the Bankruptcy Court directs such payments to be made.

     2.5    Apportionment. At or about the Closing Date, the Seller and Purchaser shall (i) make mutually satisfactory arrangements with respect to, or take readings or other measurements of, gas,

water, electricity and other utilities (the *"Utilities"*); (ii) mutually determine all real property Taxes and all charges, fees or other expenses arising out of or relating to any Purchased Contract, other than Cure Costs, which accrued but were not paid by Seller during or in respect of any period prior to Closing or which were paid by the Seller in respect of any period following the Closing, other than any such real property Taxes, charges, fees or expenses that are, under express provision of this Agreement or other agreement or instrument related hereto, expressly provided to be paid or borne by either Purchaser or Seller (the *"Apportionable Operating Expenses"*). Responsibility for the Utilities and Apportionable Operating Expenses are to be apportioned equitably as of the Closing Date.

         2.6     Purchase Price Allocation.   Purchaser shall use its commercially reasonable efforts to deliver to Seller, no later than six months following the Closing Date, a schedule (the *"Allocation Schedule"*) allocating the Purchase Price among the various assets comprising the Purchased Assets in accordance with Treasury Regulation 1.1060-1 (or any comparable provisions of state or local Tax law) or any successor provision. Such Allocation Schedule shall take into consideration the allocation required for the Liquor Escrow as set forth in Section 10.6 below. Purchaser will prepare the Allocation Schedule in good faith. Purchaser and Seller shall report and file all Tax Returns (including any amended Tax Returns and claims for refund) consistent with the Allocation Schedule and shall take no position contrary thereto or inconsistent therewith (including in any audits or examinations by any taxing authority or any other proceedings). Purchaser and Seller shall file or cause to be filed any and all forms (including U.S. Internal Revenue Service Form 8594), statements and schedules with respect to such allocation, including any required amendments to such forms. Not later than thirty (30) days prior to the filing of their respective Forms 8594 (and analogous state law forms) relating to the Contemplated Transactions, each Party shall deliver to the other Party a copy of its Form 8594 (and such analogous state law forms).

         3.     Closing Transactions.

         3.1     Closing.   The Closing of the transactions provided for herein (the *"Closing"*) shall take place at the offices of Elkins Kalt Weintraub Reuben Gartside LLP, 1800 Century Park East, Seventh Floor, Los Angeles, California 90067 at 10:00 a.m. on the first (1st) business day following the satisfaction or waiver by the appropriate Party of all the conditions contained in Section 4, or on such other date or at such other place and time as may be agreed to by the Parties hereto; *provided, however*, that the date of the Closing shall be automatically extended if any of the conditions set forth in Section 4 shall not be satisfied or waived, *subject, however*, to the provisions of Section 13 (the date on which the Closing occurs, hereinafter the *"Closing Date"*).

         3.2     Seller's Deliveries to Purchaser at Closing.   On the Closing Date, Seller shall make the following deliveries to or for the benefit of Purchaser:

         (a)     [omitted];

         (b)     deliver the certificate contemplated by Section 4.2(a), duly executed by Seller and dated as of the Closing Date;

         (c)     deliver a grant deed in form and substance satisfactory to Purchaser, duly executed by Seller, with respect to the Purchased Real Property, together with any necessary transfer declarations or other filings (and in recordable form if required by Purchaser) (the *"Quitclaim Deed"*);

         (d)     deliver an Assignment and Assumption of Leases and Contracts substantially in the form attached as Exhibit "A" hereto, duly executed by Seller, pursuant to

which Seller's interest in all Purchased Contracts shall be assigned to Purchaser (the "*Assignment of Purchased Contracts*");

(e) deliver a Bill of Sale and Assignment, substantially in the form attached as Exhibit "B" hereto, duly executed by Seller, pursuant to which Seller's interest in any Purchased Assets not otherwise assigned at the Closing shall be assigned to Purchaser (the "*Bill of Sale*");

(f) deliver a counterpart Assignment of Intangible Property Assets, duly executed by Seller, in the form and content of the assignment of intangible property attached as Exhibit "C" hereto, pursuant to which Seller's interest in and to the Intangible Property Assets shall be assigned to Purchaser (the "*Assignment of Intangible Property Assets*");

(g) all documents necessary to deliver certificates of title, duly executed by Seller, required to convey ownership of any motor vehicles or similar equipment constituting Purchased Assets;

(h) deliver appropriate evidence of the valid taking of all necessary corporate action by Seller in connection with the Contemplated Transactions, including, without limitation: (i) certified copies of the articles of incorporation and bylaws of Seller, (ii) a good standing certificate in respect of Seller, issued by the California Secretary of State; (iii) certified copies of resolutions duly adopted by Seller's directors approving the Contemplated Transactions and authorizing the execution, delivery, and performance by Seller of this Agreement; and (iv) a certificate as to the incumbency of officers of Seller executing this Agreement and any instrument or other document delivered in connection with the Contemplated Transactions;

(i) deliver certified copies of all Orders of the Bankruptcy Court pertaining to the Contemplated Transactions, including the Sale Approval Order, evidence of the entry of all such Orders on the docket of the Chapter 11 Case and of the absence on the docket of any pending appeal or motion for rehearing or reconsideration;

(j) deliver the General Release, duly executed by Seller and Chang Hun (James) Lee;

(k) deliver the Consulting Agreement and Covenant Not to Compete, duly executed by Chang Hun (James) Lee;

(l) deliver an affidavit of an officer of the Seller, sworn to under penalty of perjury, setting forth the name, address and Federal tax identification number of the Seller and stating that Seller is not a "foreign person" within the meaning of Section 1445 of the Code. If, on or before the Closing Date, Purchaser shall not have received such affidavit, Purchaser may withhold from the cash payments to Seller at Closing such sums as are required to be withheld therefrom under Section 1445 of the Code; and

(m) deliver any such other documents, funds or other things reasonably requested by Purchaser or contemplated by this Agreement to be delivered by Seller to Purchaser at the Closing.

3.3    Purchaser's Deliveries to Seller at Closing. On the Closing Date, Purchaser shall make the following deliveries to or for the benefit of Seller:

(a)    pay, by wire transfer of immediately available funds into an account of Seller designated by Seller, an amount equal to the aggregate Cure Costs of all Purchased Contracts to be assigned to Purchaser at the Closing;

(b)    pay, by wire transfer of immediately available funds, the Claim Reserve into a client trust account of LNBRB (the "*Unsecured Claims Account*"), in which such funds shall remain pending further order of the Bankruptcy Court;

(c)    deliver the certificate contemplated by Section 4.1(a), duly executed by Purchaser;

(d)    deliver a counterpart of the Assignment of Purchased Contracts, duly executed by Purchaser;

(e)    deliver an Assumption Agreement with respect to the Assumed Liabilities, substantially in the form attached as Exhibit "D" hereto, duly executed by Purchaser (the "*Assumption of Liabilities*");

(f)    deliver any certificates of title required to convey ownership of any motor vehicles or similar equipment owned by Seller, if endorsement thereof is required by Purchaser;

(g)    deliver appropriate evidence of the valid taking of all necessary limited liability company action by Purchaser in connection with the Contemplated Transactions, including, without limitation: (i) certified copies of the certificate of formation (but not the limited liability company agreement or operating agreement) of Purchaser, (ii) a good standing certificate in respect of Purchaser, issued by the Delaware Secretary of State; (iii) certified copies of resolutions duly adopted by Purchaser's managing member(s) approving the Contemplated Transactions and authorizing the execution, delivery, and performance by Purchaser of this Agreement; and (iv) a certificate as to the incumbency of those officers of Purchaser executing this Agreement and any instrument or other document delivered in connection with the Contemplated Transactions;

(h)    deliver the General Release, duly executed by Purchaser, together with satisfactory evidence that the closing of the purchase by Purchaser of all rights, title and interests held by the Bank under the Loan Documents shall have taken place;

(i)    deliver the Consulting Agreement, duly executed by Purchaser;

(j)    deliver a Request for Dismissal of Shinhan Bank v. Harvard Grand Investment, Inc. and Chang Hun Lee, Los Angeles Superior Court, Case No. BC 431824, with prejudice, signed by Purchaser as successor –in-interest to plaintiff Shinhan Bank; and

(k)    deliver any such other documents, funds or other things reasonably requested by Seller or contemplated by this Agreement to be delivered by Purchaser to Seller at the Closing.

3.4    Sales, Use and Other Taxes.  To the extent not exempt under the Bankruptcy Code, any sales, purchase, transfer, stamp, documentary stamp, use or similar taxes under the laws of the State of California, or under any federal law or the laws or regulations of any federal agency or authority, which may be payable by reason of the sale or transfer of the Purchased Assets under this Agreement or

the Contemplated Transactions (the "*Transfer Taxes*"), if any, shall be borne and paid by Purchaser. Seller shall be solely responsible for the preparation and filing of all relevant Tax Returns required to be filed in respect of such Transfer Taxes and shall pay all such Transfer Taxes.

        3.5    Possession. Right to possession of the Purchased Assets shall transfer to Purchaser on the Closing Date. Seller shall transfer and deliver to Purchaser on the Closing Date such keys, locks and safe combinations and other similar items as Purchaser may reasonably require to obtain occupation and control of the Purchased Assets, and shall also make available to Purchaser at their then existing locations the originals of all documents in Seller's actual possession that are required to be transferred to Purchaser by this Agreement.

        3.6    Closing Date. All actions to be taken on the Closing pursuant to this Agreement shall be deemed to have occurred simultaneously, and no act, document or transaction shall be deemed to have been taken, delivered or effected until all such actions, documents and transactions have been taken, delivered or effected. Unless provide otherwise herein or agreed otherwise in writing by the Parties, documents delivered at the Closing shall be dated as of the Closing Date.

        4.    Conditions Precedent to Closing.

        4.1    Conditions to Seller's Obligations. Seller's obligation to make the deliveries required of Seller at the Closing Date and otherwise consummate the Contemplated Transactions shall be subject to the satisfaction or waiver by Seller of each of the following conditions:

        (a)    All of the representations and warranties of Purchaser contained herein shall continue to be true and correct at the Closing in all material respects, and Purchaser shall have substantially performed or tendered performance of each material covenant on Purchaser's part to be performed which, by its terms, is required to be performed at or before the Closing, and Seller shall have received a certificate by an officer of Purchaser, dated as of the Closing Date, to such effect and to the effect that each of the conditions precedent to Closing set forth in Section 4.2 have been satisfied or waived by Purchaser.

        (b)    Purchaser shall have tendered delivery of all items required to be delivered by Purchaser under Section 3.3.

        (c)    No action, suit or other proceedings that is not stayed by the Bankruptcy Court shall be pending before any Governmental Body seeking or threatening to restrain or prohibit the consummation of the Contemplated Transactions, or seeking to obtain substantial damages in respect thereof, or involving a claim that consummation thereof would result in the violation of any law, decree or regulation of any Governmental Body having appropriate jurisdiction.

        (d)    The Bankruptcy Court shall have entered the Sale Approval Order in accordance with Section 8 below and the Sale Approval Order shall not have been stayed as of the Closing Date.

        (e)    Purchaser shall have delivered a Request for Dismissal of Shinhan Bank v. Harvard Grand Investment, Inc. and Chang Hun Lee, Los Angeles Superior Court, Case No. BC 431824, with prejudice.

4.2    Conditions to Purchaser's Obligations.    Purchaser's obligation to make the deliveries required of Purchaser at the Closing and otherwise consummate the Contemplated Transactions shall be subject to the satisfaction or waiver by Purchaser of each of the following conditions:

(a)    All of the representations and warranties of Seller contained herein shall continue to be true and correct at the Closing in all material respects, and Seller shall have substantially performed or tendered performance of each and every covenant on Seller's part to be performed which, by its terms, is required to be performed at or before the Closing (provided, however, that Seller shall have performed in all respects its obligations under Section 1.1 to sell, assign, transfer, convey and deliver to Purchaser all of the Seller's right, title and interest in and to all Purchased Assets free and clear of all Encumbrances (excluding any real property taxes, easements and Assumed Liabilities), and Purchaser shall have received a certificate by officers of Seller, dated as of the Closing Date, to such effect and to the effect that each of the conditions precedent to Closing set forth in Section 4.1 have been satisfied or waived by Seller.

(b)    Seller shall have tendered delivery of all items required to be delivered by Seller under Section 3.2.

(c)    No action, suit or other proceedings that is not stayed by the Bankruptcy Court shall be pending before any Governmental Body seeking or threatening to restrain or prohibit the consummation of the Contemplated Transactions, or seeking to obtain substantial damages in respect thereof, or involving a claim that consummation thereof would result in the violation of any law, decree or regulation of any Governmental Body having appropriate jurisdiction.

(d)    The Bankruptcy Court shall have entered the Sale Approval Order in accordance with Section 8 below and the Sale Approval Order shall have become a Final Order.

(e)    The closing of the purchase by Purchaser of all rights, title and interests held by the Bank under the Loan Documents shall have taken place.

(f)    Since the date of this Agreement, there shall not have been any theft, damage or destruction of a material portion of the Purchased Assets and, as of the Closing Date, the Hotel shall be open and operating in the ordinary course of business.

(g)    Since the date of this Agreement there shall have been no event, condition, change, development or other matter, or any worsening of any existing event, condition, change, development or other matter that, individually or in combination with any other event, condition, change, development or other matter or worsening thereof, has had or could reasonably be expected to have a Material Adverse Effect.

5.    Seller's Representations and Warranties.

Seller hereby makes the following representations and warranties to Purchaser:

5.1    Organization.  Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of California.  Seller has all requisite corporate power and authority to own, lease and, subject to the provisions of the Bankruptcy Code applicable to debtors in possession, to operate its properties, carry on the Business as now being conducted, and to enter into this Agreement and to consummate the Contemplated Transactions.  Seller has no Subsidiaries.

5.2    Validity and Enforceability.  The execution, delivery and performance of this Agreement by Seller and the consummation by Seller of the Contemplated Transactions has been duly authorized by all requisite corporate action.  Subject to the entry and effectiveness of the Sale Approval Order, this Agreement has been duly and validly executed and delivered by Seller and (assuming this Agreement constitutes a valid and binding agreement of Purchaser) constitutes a valid and binding agreement of Seller, enforceable against Seller in accordance with its terms, except as to the effect, if any, of (i) applicable bankruptcy, insolvency, moratorium, reorganization, or other similar laws affecting the rights of creditors generally and (ii) rules of law governing specific performance, injunctive relief and other equitable remedies.

5.3    Approvals and Consents.  No Consent by, or declaration, filing or registration with, any Governmental Body or any other Person is required to be made or obtained by Seller in connection with the execution, delivery and performance of this Agreement by Seller and the consummation of the Contemplated Transactions, except for (a) Consents by, or declarations or filings with, the Bankruptcy Court and (b) Consents, declarations, filings, registrations or rulings identified in Schedule 5.3.  The items referred to in clauses (a) and (b) of this Section 5.3 are hereinafter referred to as the *"Seller's Required Approvals."*

5.4    No Conflict.  Subject to the entry of the Sale Approval Order, neither the execution, delivery or performance of this Agreement by Seller, nor the consummation by Seller of the Contemplated Transactions, nor compliance by Seller with any of the provisions hereof, (a) conflict with or result in any breach of the articles of incorporation or bylaws of Seller, (b) result in a violation or breach of, or constitute (with or without notice or lapse of time) a default (or give rise to any right of termination, cancellation, vesting, payment, exercise, acceleration, suspension or revocation) under, any of the terms, conditions or provisions of, any note, bond, mortgage, deed of trust, security interest, or Contract to which Seller is a party or by which Seller's properties or assets may be bound or affected, (c) violate any Legal Requirement applicable to the Seller or to the Seller's properties or assets, (d) result in the creation or imposition of any Encumbrance on any asset of the Seller, or (e) cause the suspension or revocation of any Business Permits or Licenses.

5.5    Litigation.  There is no material Legal Proceeding (other than the Chapter 11 Case) pending or, to the Seller's Knowledge, threatened against or affecting Seller that, once the Sale Approval Order is given effect, could result in the imposition of any Liability on Purchaser in respect of the Purchased Assets, nor is there any material judgment or Order of any Governmental Body (other than the Bankruptcy Court) outstanding against Seller.

5.6    Compliance with Laws.  Seller has not been given notice or been charged with any material violation of any Law of any Governmental Body.  Seller is not in violation of any Legal Requirement.  No material investigation or review by any Governmental Body is pending or, to the Knowledge of the Seller, threatened, against Seller or any of its assets and properties, nor has any Governmental Body indicated to Seller an intention to conduct the same.  Seller has complied in all material respects with all applicable Laws in the operation of the Business and ownership and use of the Purchased Assets.

5.7    Financial Statements.  Seller's most recent financial statement relating to Seller or the operations of the Hotel (the "Seller's Financial Statement(s)") are attached as Schedule 5.7, subject to the following conditions and disclosures:

(a) The attached Seller's Financial Statement has not been tested or confirmed for accuracy;

(b) Seller's Financial Statement does not comply with Generally Accepted Accounting Principles;

(c) Seller has only one set of books and records. The Seller's Financial Statement was the one an outside accountant compiled based on Seller's internal accounting data given to the outside accountant. The outside accountant did not examine or audit the Seller's books and records to assure the accuracy or reliability of Seller's internal accounting data. This financial statement was given to the Seller by the accountant based on Seller's internal accounting data; and

(d) Seller does not represent or guarantee to the Purchaser that the Seller's Financial Statement is either an accurate representation of the Seller's financial position as of March 31, 2010 or that it complies with Generally Accepted Accounting Principles. The Seller is not responsible for any inaccuracy of the Seller's Financial Statement. Although the Seller's Financial Statement has not been tested or confirmed for its accuracy, it was compiled based on internal accounting data prepared by Seller's accounting staff.

5.8    Absence of the Material Adverse Changes and Undisclosed Liabilities.    To Seller's Knowledge, there has been no Material Adverse Effect with respect to the Financial Statement(s), other than the filing of the Chapter 11 Case and Hilton's threatened termination of Seller's franchise agreement as of July 1, 2010.

5.9    Title to and Use of Property.    Seller has, and subject to the Sale Approval Order shall convey to Purchaser at the Closing, good and marketable title to all of the Purchased Assets, in each case free and clear of all Encumbrances (excluding any real property taxes, easements and Assumed Liabilities). The Purchased Assets include all property of the Seller, tangible and intangible, used or useable in connection with the Business or necessary to conduct the Business as it is currently conducted. Except as disclosed on Schedule 5.9, all of the Purchased Assets are, and at the Closing will be, located at the Hotel.

5.10    Assets Necessary to Continue to Conduct Business.    The Purchased Assets constitutes all of the assets, properties and rights used in the Business as presently conducted other than the Excluded Assets. Except as set forth in Schedule 5.10, no Affiliate of Seller has any direct or indirect interest in any asset, property or right used in, or necessary to conduct, the Business as currently conducted by Seller.

5.11    Real Property.

(a)    Seller owns a fee interest in all real property used in the connection with the operation of the Hotel.

(b)    There are no leases, subleases, licenses and other agreements granting to any Person or entity other than the Seller any right to the possession, use, occupancy or enjoyment of the real property used in connection with the operation of the Hotel, or any portion thereof. No portion of the Hotel has suffered any material damage by fire or other casualty which has not heretofore been completely repaired and restored to its original condition.

(c)     Seller does not own or hold, and is not obligated under or a party to, any option, right of first refusal or other contractual right to purchase, acquire, sell or dispose of the Hotel or any portion thereof or interest therein.

5.12    Other Personal Property.

(a)     Schedule 5.12(a) sets forth an accurate and complete list of all Furniture and Equipment and Inventory located at the Hotel, to Seller's Knowledge.

(b)     Schedule 5.12(b) sets forth an accurate and complete list of all Deposits of the Seller, to Seller's Knowledge.

(c)     Schedule 5.12(c) sets forth an accurate and complete list of all Receivables of the Seller, to Seller's Knowledge.

(d)     Sections 5.12(d) sets forth an accurate and complete list of all advance bookings, to Seller's Knowledge.

(e)     All items included in Inventory consist of finished goods saleable in the ordinary course of business of Seller except for obsolete items and items of below-standard quality, all of which have been written off or written down to net realizable value on the accounting records of Seller as of the Closing Date.  Seller is not in possession of any Consigned Inventory or other inventory not owned by Seller, including goods already sold (other than to the extent of personal property of guests located in the safe deposit boxes at the Hotel).

5.13    Intellectual Property.  Seller owns, has licenses to use, or otherwise possesses legally enforceable rights to use, all Intellectual Property, used or useable in connection with the Business or necessary for the conduct of the Business as presently conducted.  Seller is not, and during the three (3) year period prior to the Effective Date has not been, a party to any action, nor are there, or during the one (1) year period prior to the Effective Date have there been, any actions, or to Seller's knowledge, threatened, alleging infringement, misappropriation or other wrongful use or exploitation by Seller or challenging Seller's ownership, use, validity, or enforceability, of any Intellectual Property, nor, to the Knowledge of Seller, is there any reasonable basis therefor.  To the Knowledge of Seller, Seller has not infringed upon or otherwise violated the intellectual property rights of third parties or received any Claim, complaint, demand or notice alleging any such infringement or violation, or knows of any basis for any such Claim.  Purchaser is aware of the Seller's default under the franchise agreement and of the notice of termination as of July 1, 2010.

5.14    Contracts.

(a)     Schedule 5.14(a) is an accurate and complete list of Personal Property Leases to Seller's Knowledge.

(b)     Schedule 5.14(b) is an accurate and complete list of all Other Contracts, to Seller's Knowledge.

(c)     Schedule 5.14(a) and Schedule 5.14(b) together constitute an accurate and complete list of all of the Seller's Contracts.  True and complete copies of each such written Contract (and written summaries of the terms of any such oral Contracts, and oral modifications of any written Contract) have been delivered to Purchaser, to Seller's Knowledge.

(d)      Schedule 5.14(c) constitutes an accurate and complete schedule of the amounts that Seller reasonably believes are owing as Cure Costs of all Seller's Contracts, to Seller's Knowledge.

5.15      Business Permits.  To the Knowledge of the Seller, Schedule 5.15 is an accurate and complete list of all Business Permits and all such Business Permits are in full force and effect. To the Knowledge of the Seller, no material violations are or have been committed in respect of any Business Permit and no proceeding is pending or threatened to revoke or limit any Business Permit. To the extent permitted by law, Seller has the power to assign such Business Permits.

5.16      Employees and Labor Relations.

(a)      Schedule 5.16(a) contains an accurate and complete list of the following information for each employee of the Seller:  name; job title; current compensation paid or payable; vacation accrued; service credited for purposes of vesting and eligibility to participate in Seller's Benefit Plans.

(b)      There are no labor disputes, material grievances, arbitration proceedings, or any material union organization activities, strikes or work stoppages pending, or to the Seller's Knowledge, threatened between Seller and any of its employees. None of the employees of Seller is represented by a labor union and Seller is not a party to any collective bargaining agreement. There are no unfair labor practice charges, complaints or proceedings pending or, to the Seller Knowledge, threatened against or involving Seller.  There are no representation proceedings pending and no labor organization or group of employees has made a demand for recognition which is currently pending.

(c)      Seller is in compliance in all material respects with all applicable Laws relating to employment and employment practices, the employment of labor, and has not engaged in any unfair labor practice or unlawful employment practice. Seller has not received written or, to Seller's knowledge, oral notice of any employment-related charge or complaint against Seller before the Equal Employment Opportunity Commission or the Department of Labor or any other Governmental Body.

(d)      Seller has not implemented any plant closing or mass layoff of employees that could implicate the Worker Adjustment and Refraining Notification Act of 1988, as amended or any similar state, local or foreign laws (collectively, the "*WARN Act*"). All previous reductions in workforce implemented by Seller has complied with the WARN Act.

(e)      Schedule 5.16(e) contains a true and correct list of all former employees of Seller who, in connection with the Contemplated Transactions, may become "M & A qualified beneficiaries" for whose COBRA benefits Purchaser may become responsible as a "successor employer" under Treasury Regulation 54.4980B-9.

5.17      ERISA; Seller Benefit Plans.

(a)      No Seller Benefit Plan or comparable benefit plan maintained, sponsored or contributed to by any ERISA Affiliate is, and neither Seller nor any ERISA Affiliate has any liability, whether absolute or contingent, with respect to: (i) any "multiemployer plan" (as defined in Section 3(37) of the Employee Retirement Income Security Act of 1974, as amended, "*ERISA*"), or (ii) any other pension plan subject to Title IV of ERISA, Part 3 of Title I of ERISA or Section 412 of the Code. For purposes of this Agreement, "*ERISA Affiliate*" means any entity

(whether or not incorporated) that is required to be treated as a single employer with Seller under Section 414(b), (c), (m) or (o) of the Code.

(b)      Except as required by applicable law, the Seller has no obligation, whether absolute or contingent and whether under a Seller Benefit Plan or otherwise, to provide any of the following retiree or post-employment benefits to any Person: medical, prescription, dental, disability or life insurance benefits. Seller and each of its ERISA Affiliates are in compliance in all material respects with the applicable requirements of the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended, the regulations thereunder and any similar state law.

(c)      None of the Purchased Assets or other assets of Seller or any ERISA Affiliate is, or could reasonably be expected to become, the subject of any lien arising under ERISA or the Code.   There are no liens arising under ERISA or the Code with respect to the operation, termination, restoration or funding of any Seller Benefit Plan or arising in connection with any excise tax or penalty tax with respect to any Seller Benefit Plan. With respect to the Seller Benefit Plans, no event has occurred and, to Seller's Knowledge, there exists no condition or set of circumstances in connection with which Purchaser could be subject to any liability under the terms of, or with respect to, such Seller Benefit Plans, or under ERISA, the Code or any other applicable Law with respect to such Seller Benefit Plans.

(d)      Neither the execution and delivery of this Agreement, nor the consummation of the Contemplated Transactions, either alone or in combination with another event (whether contingent or otherwise), including without limitation any termination of employment, will: (i) entitle any current or former employee, consultant or director of Seller to any payment; (ii) increase the amount of compensation or benefits due to any such employee, consultant or director; (iii) accelerate the vesting, funding or time of payment of any compensation, equity award or other benefit; or (iv) result in any "parachute payment" under Section 280G of the Code.

(e)      Seller is not and has not been a party to any collective bargaining or similar agreement and there are no labor unions or other organizations representing, purporting to represent or, to Seller's Knowledge, attempting to represent, any employee of Seller. There are no unfair labor practice complaints pending against Seller before the National Labor Relations Board or any other Governmental Body nor, to Seller's Knowledge, are any such complaints threatened.   Seller has not experienced any strike, slowdown or work stoppage nor, to Seller's Knowledge, are any such strikes, slowdowns, work stoppages or lockouts threatened.

(f)      In the three years prior to the date hereof, Seller has not effectuated: (i) a "plant closing" (as defined in the WARN Act or any similar state, local or foreign law) affecting any site of employment or one or more Facilities or operating units within any site of employment or facility of Seller; or (ii) a "mass layoff" (as defined in the WARN Act, or any similar state, local or foreign law) affecting any site of employment or facility of Seller.

(g)      For purposes of this Agreement, "*Seller Benefit Plan*" means each "employee benefit plan" as defined in Section 3(3) of ERISA and each other plan, policy, program, agreement, understanding and arrangement (whether written or oral) providing compensation or other benefits to any current or former director, officer, employee or consultant (or to any dependent or beneficiary thereof) of Seller which is now or has been maintained, sponsored or contributed to by Seller or under the terms of which Seller has or is reasonably likely to have any obligation or liability, whether actual or contingent, including, without

limitation, all employment, consulting, severance, termination, incentive, bonus, deferred compensation, retirement, pension, savings, profit sharing, retention, change in control, vacation, holiday, cafeteria, medical, disability, life, accident, fringe benefit, welfare and stock-based compensation plans, policies, programs, agreements, understandings or arrangements.

(h)     Notwithstanding anything to the contrary contained in this Agreement, Purchaser is not assuming any Seller Benefit Plan or any other plan referenced in this Section 5.17 and Seller shall remain responsible for all of same.

5.18     Environmental Matters.  Seller has provided Purchaser with copies of all material documents and reports in its possession or control describing or otherwise relating to past or present events, conditions, circumstances, activities, practices, incidents, agreements, actions or plans which have given rise to or would be reasonably likely to give rise to any material Liability of Seller under Environmental Laws and any material environmental Liability that would adversely affect the value of the Purchased Assets.  Seller is in material compliance with all Environmental Laws, which compliance includes the possession by Seller of all Business Permits and other governmental authorizations required under applicable Environmental Laws for the operation of the Business, and compliance with the terms and conditions thereof.  Seller has not received any written notice not subsequently resolved with respect to the Business of, or any property owned or leased by, Seller from any Governmental Body or third party alleging that the Seller is not in compliance with or subject to any Liability under any Environmental Laws.  Except for releases authorized under or pursuant to Environmental Laws, or Business Permits issued thereunder, there has been no release of any Hazardous Substance in excess of a quantity for which a report is required under Environmental Laws, on any real property of the Seller in connection with the Business.  Seller is not liable for any costs, obligations, penalties, fines or forfeitures for failure to comply with any Environmental Laws or necessary to achieve or maintain compliance with Environmental Laws, other than such costs in the ordinary course of business, or with respect to any environmental conditions or any release or presence of any Hazardous Substance, nor is Seller required to remedy any such existing condition or remove any Hazardous Substance from any real property.

5.19     Insurance.  Schedule 5.19 sets forth a list of all policies or binders of fire, liability, product liability, workers' compensation, vehicular and other insurance held by or on behalf of the Seller.  Such policies or binders are valid and binding in accordance with its terms, are in full force and effect, and insure against risks and Liabilities to an extent and in a manner customary in the industry in which the Seller operates.  Seller is not in default with respect to any provisions contained in any such policy or binder nor has Seller failed to give any notice or present any Claims under any such policy or binder in due and timely fashion.  Except as set forth on Schedule 5.19, there are no outstanding unpaid Claims for which the administrator of the Seller's insurance policies or the Seller has established a reserve in excess of $50,000 under any such policy or binder, and Seller has not received any notice of cancellation or non-renewal of any such policy or binder.  There is no inaccuracy in any application for such policies or binders, no failure to pay premiums when due and no similar state of facts that might form the basis for termination of any such insurance.  Except as set forth on Schedule 5.19, Seller has not received any written notice from any of its insurance carriers or any Governmental Body that any insurance premiums will or may be materially increased in the future or that any insurance coverage listed on Schedule 5.19 will or may not be available in the future on substantially the same terms as now in effect, and to the Seller's Knowledge, there is no basis for the issuance of any such action.

5.20     Transactions with Related Parties.  No officer, director or shareholder of Seller, or officer, director, partner, manager or relative of any such officers, directors and shareholders, has with respect to the Business or the Purchased Assets (a) loaned money or other property to Seller that has not been repaid or returned, (b) any contractual relationship or other claims, express or implied, of any kind whatsoever against Seller or (c) any interest in any of the Purchased Assets.

5.21     Complete Copies of Materials.  Seller has delivered or made available true and complete copies in all material respects of each document listed on the Schedules attached hereto.

5.22     Broker's or Finder's Fees.  No agent, broker, person or firm acting on behalf of Seller is, or will be, entitled to any commission or broker's or finder's fees from Purchaser in connection with the Contemplated Transactions.

5.23     Liabilities Under Purchased Contracts.  Seller is not aware of any Liabilities under any Purchased Contracts, except as expressly set forth in the Purchased Contracts.

5.24     No Management Agreement.  There is no management agreement in effect with respect to the operation of the Hotel.

6.     Purchaser's Warranties and Representations.

In addition to the representations and warranties contained elsewhere in this Agreement, Purchaser hereby makes the following representations and warranties to Seller:

6.1     Organization.  Purchaser is a limited liability company duly organized, validly existing and in good standing under the laws of Delaware.  Purchaser has all requisite limited liability company power and authority to own, lease and operate its properties, execute and deliver this Agreement, and to perform its obligations hereunder and consummate the Contemplated Transactions.

6.2     Validity and Enforceability.  This Agreement has been duly executed and delivered by Purchaser and constitutes the valid and binding obligation of Purchaser enforceable against it in accordance with its terms, except as may be limited by any bankruptcy, insolvency, reorganization, moratorium, fraudulent transfer or other laws (whether statutory, regulatory or decisional), now or hereafter in effect, relating to or affecting the rights of creditors generally or by equitable principles (regardless of whether considered in a proceeding at law or in equity).

6.3     No Conflict.  The execution, delivery and performance of this Agreement and all writings relating hereto by Purchaser have been duly and validly authorized.  The execution and delivery of this Agreement, the consummation of the Contemplated Transactions, and the performance of, fulfillment of and compliance with the terms and conditions hereof by Purchaser do not and will not: (i) conflict with or result in a breach of the certificate of formation or limited liability company agreement of Purchaser; (ii) violate any Legal Requirement; or (iii) violate or conflict with or constitute a default under any agreement, instrument or writing of any nature to which Purchaser is a party or by which Purchaser or its assets or properties may be bound.

6.4     Financial Resources.  Purchaser has the financial resources necessary to consummate the Contemplated Transactions upon the terms and conditions set forth in this Agreement, and such financial resources are not subject to any constraints, conditions or contingencies that could in any way materially affect the Purchaser's ability to consummate the Contemplated Transactions or perform hereunder.

6.5     Broker's or Finder's Fees.  No agent, broker, person or firm acting on behalf of Purchaser is, or will be, entitled to any commission or broker's or finder's fees from Seller in connection with the Contemplated Transactions.

7.     "AS IS" Transaction.  Purchaser hereby acknowledges and agrees that, except only as provided in Section 5 above, Seller makes no representations or warranties whatsoever, express or

implied, with respect to any matter relating to the Purchased Assets, the transferability of the Purchased Assets or any portion thereof, the terms, amount, validity, collectability or enforceability of the Receivables or any Assumed Liabilities or Seller's Contract, the merchantability or fitness of the Furniture and Equipment, the Inventory or any other portion of the Purchased Assets for any particular purpose, or any other matter or thing relating to the Purchased Assets or any portion thereof. Without in any way limiting the foregoing, Seller hereby disclaims any warranty (express or implied) of merchantability or fitness for any particular purpose as to any portion of the Purchased Assets. Purchaser further acknowledges that Purchaser has conducted an independent inspection and investigation of the physical condition of all portions the Purchased Assets and all such other matters relating to or affecting or comprising the Purchased Assets and/or the Assumed Liabilities as Purchaser deemed necessary or appropriate and that in proceeding with the Contemplated Transactions, except for the representations set forth in Section 5 above. Purchaser is doing so based solely upon such independent inspections and investigations. Accordingly, except only for the representations set forth in Section 5 above, Purchaser will accept the Purchased Assets at the Closing "AS IS," "WHERE IS," and "WITH ALL FAULTS." Seller's representations and warranties set forth in Section 5 above shall not survive the Closing.

       8.    Bankruptcy Court Approvals. Prior to the date hereof, Seller has made a motion (the "**Sale Motion**") for an Order by the Bankruptcy Court, substantially in the form attached hereto as Exhibit "E", approving the sale of the Purchased Assets to Purchaser on the terms and conditions set forth in this Agreement (the "**Sale Approval Order**"). Any changes to the form of the Sale Approval Order must be approved by Purchaser in its sole and absolute discretion and by Seller in its reasonable discretion. If requested by Seller or the Bankruptcy Court, Purchaser shall provide adequate assurance of future performance (satisfactory to the Bankruptcy Court) to the counterparties to the Seller's Contracts. Following the filing of the Sale Motion, Seller shall use reasonable efforts to obtain the Sale Approval Order.

       9.    Commercially Reasonable Efforts.    Subject to the terms and conditions of this Agreement:

       9.1    During the period prior to Closing, Seller and Purchaser shall (a) use their commercially reasonable efforts (i) to cause the conditions in Section 4 to be satisfied, (ii) to deliver or cause to be delivered at the Closing the items to be delivered by Seller and Purchaser pursuant to Section 3.2 and Section 3.3, and (iii) to take all other actions to consummate the Contemplated Transactions, and (b) not take any action that will have the effect of unreasonably delaying, impairing or impeding the receipt of any authorizations, Consents, or Orders to be sought pursuant to this Agreement.

       9.2    From and after the Closing, Seller and Purchaser shall use commercially reasonable efforts to deliver or cause to be delivered such additional documents and other papers and to take or cause to be taken such further actions as may be necessary, proper or advisable to make effective the Contemplated Transactions and to carry out the provisions hereof.

       9.3    From and after the Closing, Purchaser and Seller shall reasonably cooperate in the transition of the Business from Seller to Purchaser, provided that neither Party shall be required to expend other than nominal unreimbursed costs in providing such cooperation.

       10.    Conduct Pending Closing.

       10.1    Except with the prior written consent of Purchaser, as otherwise contemplated or permitted by this Agreement or as required by the Bankruptcy Code, from the Effective Date until the Closing Date, Seller shall operate the Business in the ordinary course of business (taking into account Seller's status as debtors-in-possession), comply with all Legal Requirements applicable to the operation

of its business and preserve its present business organization intact. From the Effective Date until the Closing Date, Seller shall use commercially reasonable efforts to:

(a)     maintain in full force and effect the Business Permits in all material respects;

(b)     maintain all of the Purchased Assets in a manner consistent with past practices, reasonable wear and tear excepted and maintain the types and levels of insurance currently in effect in respect of the Purchased Assets;

(c)     upon any damage, destruction or loss to any Purchased Assets, apply any insurance proceeds received with respect thereto to the prompt repair, replacement and restoration thereof to the condition of such Purchased Assets before such event or, if required, to such other (better) condition as may be required by applicable Legal Requirements;

(d)     pay when due all undisputed amounts owed under the Seller's Contracts; and

(e)     consult with Purchaser on all material aspects of the Business as may be reasonably requested from time to time by Purchaser, including, but not limited to, personnel, accounting and financial functions.

10.2     Except as otherwise contemplated or permitted by this Agreement, from the Effective Date until the Closing Date, Seller shall not, without the prior written consent of Purchaser:

(a)     Enter into any new Seller's Contracts or terminate or amend any of the Seller's Contracts (or execute any amendments or modifications to any Seller's Contracts), or cancel, modify or waive any claims held in respect of the Purchased Assets or waive any material rights of value;

(b)     do any act or fail to do any act that will cause a material breach or default in any of the Seller's Contracts;

(c)     sell, transfer or otherwise dispose of any of the Purchased Assets except in the ordinary course of business, consistent with past practices;

(d)     modify any of its sales practices or Receivables collections practices from those in place on the date hereof, including offering any discounts, incentives or other accommodations for early payment, provided that Seller shall in no case implement any distress sales practices or sales practices creating any liabilities for the Business that would survive the Closing and become an obligation of Purchaser (e.g., the issuance of coupons);

(e)     cease operations at the Hotel;

(f)     grant to any Transferred Employee any increase in compensation, except increases to non-management employees in the ordinary course of business, whether under any Seller Benefit Plan or otherwise, and from adopting, entering or amending any Seller Benefit Plans (except as may be required by applicable law);

(g) terminate any Transferred Employee related to the Business, except non-management Transferred Employees in the ordinary course of business so long as such terminated Transferred Employees are not paid more than two weeks of severance;

(h) hire any person that would be a Transferred Employee under this Agreement, except store-level Transferred Employees to the extent reasonably necessary for the operation of the Business;

(i) make or rescind any material Tax election or take any material Tax position (unless required by law) or file any Tax Return or change its fiscal year or financial or Tax accounting methods, policies or practice, or settle any Tax Liability, except in each case as would not reasonably be expected to materially affect Purchaser;

(j) modify, rescind or terminate a material Business Permit or License, allowance, or credit (or application therefor) relating to the Business or the Purchased Assets;

(k) dispose of or fail to keep in effect any material rights in, to, or for the use of any of the Intangible Property Assets, except for rights which expire or terminate in accordance with their terms;

(l) subject its assets to any material Encumbrances (excluding any real property taxes and easements);

(m) directly or indirectly make any dividend or other distribution to shareholders or repurchase or reacquire any equity interests;

(n) issue any purchase order for goods in excess of $25,000;

(o) incur any Indebtedness in excess of $5,000;

(p) distribute any Deposits to Seller;

(q) settle any Claims; or

(r) authorize any of the foregoing, or commit or agree to take actions, whether in writing or otherwise, to do any of the foregoing.

10.3 Seller shall promptly inform Purchaser in writing of the occurrence or non-occurrence of any event actually known by Seller which would cause any condition set forth in Section 4.2 not to be satisfied or the breach of any covenant hereunder by Seller.

10.4 Purchaser and Purchaser's financial advisors, legal counsel, accountants, consultants, financing sources and other authorized representatives shall be authorized and entitled, in Purchaser's discretion and without the involvement or presence of Seller or its agents, to contact and to enter into discussions and negotiate with Seller's landlords, tenants, lenders, bankers, vendors, suppliers, strategic business partners and other third parties, including but not limited to Governmental Bodies, regarding the Contemplated Transactions and Purchaser's potential business relationships with such persons following the Closing, and Seller shall provide contact information and other reasonable cooperation to Purchaser in connection with such activities. From the date of this Agreement through the Closing Date, Seller shall afford Purchaser and such persons reasonable access during ordinary business hours to the Property (for inspection purposes) and to Seller's employees, consultants and independent

contractors and to all the books and records of Seller relating to the Business or to the assets or Liabilities of Seller and shall furnish to Purchaser and such persons, as promptly as practicable, all other information as Purchaser or any of such persons may reasonably request in furtherance of the Contemplated Transactions; *provided, however*, that no investigation pursuant to this Section 10.4 shall affect any representations or warranties made herein or the conditions herein to the obligations of the parties to consummate the Contemplated Transactions.

    10.5 Each Party agrees that it will not make any public announcement or issue any press release or respond to any press inquiry with respect to this Agreement or the Contemplated Transactions without the prior approval of the other Party (which approval will not be unreasonably withheld), except as may be required (i) by any applicable Legal Requirement, or (ii) to administer the Chapter 11 Case.

    10.6 Liquor License. Seller will cooperate with Purchaser in all reasonable respects in connection with the transfer of liquor licenses used in connection with the operation of the Hotel to Purchaser or Purchaser's designee, including execution and delivery of the ABC-211A License Transfer Request form as part of Purchaser's application for new liquor licenses and temporary permits. Purchaser shall satisfy all claims of creditors of Seller relating to the purchase and sale of alcoholic beverages at the Hotel through the date of the transfer of the liquor licenses. Purchaser shall promptly commence all actions required to obtain a temporary license in its own name. Purchaser or its designee shall file its license application within ten (10) days of the date of this Agreement and shall diligently pursue the application. Seller shall cooperate with Purchaser in filing all required renewal forms for the existing license and Purchaser or its designee shall be responsible for paying any and all license renewal fees. Seller will enter into an interim alcoholic beverage agreement with Purchaser and Purchaser's manager (in the form of that attached hereto as Exhibit "H") to authorize Seller's continuing operations until such time as temporary permits to operate the licensed business at the Hotel are issued to Purchaser or Purchaser's designee.

    11. Employee Matters.

    11.1 Purchaser may cause a management company (the "Management Company") to make offers of employment to some of the employees of Seller employed as of the Closing Date at the Hotel.  Such offers shall provide for base salary or hourly wage rate, as applicable, and other compensation as the Management Company shall determine at its sole discretion.  Seller shall (i) cooperate with and use its reasonable commercial efforts to make reasonably accessible to the Management Company those employees of Seller to whom the Management Company anticipates making offers of employment and (ii) assist the Management Company in its efforts to secure satisfactory employment arrangements with those employees of Seller. Effectively immediately prior to the Closing, Seller shall terminate the employment of all employees of Seller and pay said employees all accrued salaries, vacation pay, accrued sick pay, accrued holiday pay and any other accrued benefits and neither Purchaser nor the Management Company shall have any obligations with respect thereto.

    11.2 Seller shall be solely liable for complying with the WARN Act and any and all comparable state law obligations, including without limitation, the California WARN Act, as amended, Cal. Lab. Code § 1400 et. seq. (*"Cal WARN"*) (and for any failures to so comply), in any case, applicable to employees of Seller for any reason (including, for the avoidance of doubt, any employees of Seller who are not offered employment with the Management Company and/or who do not accept and commence employment with the Management Company).

    11.3 Any employment opportunity offered by the Management Company may be "at will" and may be terminated by the Management Company or any of its affiliates at any time for any

reason. Nothing in this Agreement shall: (i) be deemed to prevent or restrict in any way the right of Purchaser to terminate, reassign, promote or demote any of the Transferred Employees after the Closing or to change the title, powers, duties, responsibilities, functions, locations, salaries, other compensation or terms or conditions of employment of such Transferred Employees; (ii) create any third-party rights in any Transferred Employees or any current or former employees or other service providers of Seller (or any beneficiaries or dependents of the foregoing); or (iii) obligate Purchaser, the Management Company or any of their affiliates to offer any employment opportunity to any employee of Seller or adopt or maintain any employee benefit plan or other compensatory arrangement at any time.

           11.4    Seller shall be solely liable for all wages, remuneration and other Liabilities, whether actual or contingent: (i) associated with any employee or other service provider of Seller (or any dependent thereof) who does not become a Transferred Employee, including in connection with any termination of any such service relationship; (ii) that arise in connection with any Transferred Employee (or any dependent thereof) on or prior to the Closing Date (including any lawsuits filed by any such Transferred Employees); and (iii) that arises with respect to any Seller Benefit Plan at any time. Without limiting the generality of the foregoing, neither Purchaser nor the Management Company shall, at any time, have any obligation or liability with regard to any wages, benefits, severance, retention, employment, change-of-control, pension, retirement, equity or other plan, program, policy or agreement of or with Seller.

           12.    Termination.

           12.1    Termination by Mutual Consent. This Agreement may be terminated at any time prior to the Closing Date by mutual written agreement of the Parties.

           12.2    Termination by Either Purchaser or Seller. This Agreement may be terminated at any time prior to the Closing Date by either Purchaser or Seller if any Governmental Body shall have issued an Order permanently restraining, enjoining or otherwise prohibiting the consummation of the Contemplated Transactions and either (i) thirty (30) days shall have elapsed from the issuance of such Order and such Order has not been removed or vacated, or (ii) such Order shall have become final and non-appealable.

           12.3    Termination by Seller. This Agreement may be terminated at any time prior to the Closing Date by Seller as follows:

           (a)    if there has been a material breach by Purchaser, which Purchaser has failed to cure within five (5) days following its receipt of written notice thereof from Seller;

           (b)    if any condition precedent of Seller specified in Section 4.1 shall not have been satisfied or waived and shall have become impossible to satisfy, unless the failure of such condition to have been satisfied was caused primarily by a material breach by Seller; or

           (c)    if the Closing Date shall not have occurred on or before 5:00 p.m. Pacific time on the Outside Date, but only to the extent the Closing has not occurred as of the Outside Date for reasons other than Seller's failure to meet its obligations hereunder, including without limitation using all diligent and commercially reasonable efforts to obtain approval of the Sale Approval Order by the dates set forth herein.

           12.4    Termination by Purchaser. This Agreement may be terminated at any time prior to the Closing Date by Purchaser as follows:

(a)      if there has been a material breach by Seller, which Seller has failed to cure within five (5) days following its receipt of written notice thereof from Purchaser;

(b)      if any condition precedent of Purchaser specified in Section 4.2 shall not have been satisfied or waived or, in the reasonable judgment of Purchaser, shall have become reasonably unlikely to be satisfied, unless the failure of such condition to have been satisfied was caused primarily by a material breach by Purchaser;

(c)      if the Bankruptcy Court enters any Order confirming any Chapter 11 Plan or approving any transaction involving either:  (a) the consummation of the sale of all, or any portions which, in the aggregate, involve substantially all, of the Business by the Seller to a purchaser other than the Purchaser and/or one or more of its Affiliates, at any time during the pendency of the Bankruptcy Case or as a part of, or pursuant to, any plan of reorganization confirmed in the Bankruptcy Case; or (b) the filing of a plan of reorganization in the Bankruptcy Case that does not include a sale of all, or any portions of which in the aggregate involve substantially all, of the Business by the Seller to the Purchaser and/or one or more Affiliates of the Purchaser;

(d)      if the Sale Approval Order shall not have been entered by 5:00 p.m. Pacific time on June 23, 2010;

(e)      if the Closing Date shall not have occurred on or before 5:00 p.m. Pacific time on the Outside Date;

(f)      if the Chapter 11 Case shall be converted into a case under Chapter 7 of the Bankruptcy Code or dismissed, or if any trustee is appointed in the Chapter 11 Case; or

(g)      if for any reason (other than Purchaser's failure to provide adequate assurance of future performance sufficient to satisfy the relevant requirements of Section 365 of the Bankruptcy Code) Seller shall be unable, or shall fail, to assume and assign to Purchaser at the Closing all Seller's material Contracts that are or become Purchased Contracts pursuant to Section 1.3.

12.5      Effect of Termination.   In the event of termination by either Party of this Agreement pursuant to this Section 12, written notice thereof shall as promptly as practicable be given to the other Party and thereupon this Agreement shall terminate and the Contemplated Transactions shall be abandoned without further action by the Parties hereto.  Upon termination of this Agreement, (a) except as provided in this Section 12.5 this Agreement shall cease to have any force or effect, (b) the Parties shall not have any Liability to each other, except for fraud, breach of representation or warranty, or breach of contract arising on or before the date of such termination, and (c) the Parties under this Agreement shall cease to have any further obligations under this Agreement except pursuant to Sections 12, 14.1, 14.9, 14.15, and 14.17 (as such obligations are affected by any defined terms contained herein relating thereto), and (d) all filings, applications and other submissions made pursuant to the Contemplated Transactions shall, to the extent practicable, be withdrawn from the government authority or person to which made.

12.6      Notification of Certain Events.   Seller shall give notice to Purchaser promptly upon becoming aware of any occurrence, or failure to occur, of any event, which occurrence or failure to occur has caused or could reasonably be expected to cause any condition to the obligations of Purchaser to effect the Contemplated Transactions not to be satisfied.  If Seller give Purchaser a notice pursuant to this Section 12.6, then Purchaser shall be permitted to terminate this Agreement pursuant to Section 12.4.

13.    Post-Closing Matters.  From time to time following the Closing:

(a)    To the extent consistent with applicable law and this Agreement, Seller shall make available to Purchaser such data in personnel records of Transferred Employees as is reasonably necessary for Purchaser to transition such employees into Purchaser's records.

(b)    Seller and Purchaser shall, and shall cause their respective Affiliates to, execute, acknowledge and deliver all such further conveyances, notices, assumptions, releases and acquaintances and such other instruments, and shall take such further actions, as may be reasonably necessary or appropriate to assure fully to Purchaser and its respective successors or assigns, all of the properties, rights, titles, interests, estates, remedies, powers and privileges intended to be conveyed to Purchaser under this Agreement and to assure fully to Seller and its successors and assigns, the assumption of the liabilities and obligations intended to be assumed by Purchaser under this Agreement, and to otherwise make effective the Contemplated Transactions.

13.2    Reasonable Access to Records and Certain Personnel.  In order to facilitate Seller's efforts to administer and close the Chapter 11 Case (including, without limitation, the preparation of filings in the Chapter 11 Case and state, local and federal Tax Returns and other filings, reconciliation of claims filed in the Chapter 11 Case, removal of corporate and other records and information relating or belonging to entities other than Seller), Purchaser shall, for a period of six (6) months following the Closing, permit Seller and their agents and other professionals employed in the Chapter 11 Case to have a reasonable number of copies of the books and records of the Business existing as of the Closing Date for the purposes of the continuing administration of the Chapter 11 Case (including, without limitation, the allowance or disallowance of any claims, the pursuit of any avoidance, preference or similar actions, and the preparation of final Tax Returns), which copies Purchaser shall deliver to such Person upon reasonable advance notice.

13.3    Use of Intellectual Property.  Following the Closing Date, Seller shall not use any Intellectual Property Assets included in the Purchased Assets in connection with any business activity.

13.4    Brokerage Obligations.  Seller and Purchaser each represent and warrant to the other that such Party has incurred no liability to any broker or agent with respect to the payment of any commission or other compensation regarding the consummation of the Contemplated Transactions. It is agreed that if any claims for commissions, fees or other compensation, including, without limitation, brokerage fees, finder's fees, or commissions are ever asserted against Purchaser or Seller in connection with this transaction by any Party, all such claims shall be handled and paid by the Party whose actions form the basis of such claim and such Party shall indemnify, defend (with counsel reasonably satisfactory to the Party entitled to indemnification), protect and save and hold the other harmless from and against any and all such claims or demands asserted by any person, firm or corporation in connection with the Contemplated Transactions.

14.    Miscellaneous.

14.1    Attorneys' Fees.  In the event that either Party hereto brings an action or other proceeding to enforce or interpret the terms and provisions of this Agreement, each Party in that action or proceeding shall bear its own attorneys' fees, costs and expenses (including, without limitation, all court costs and reasonable attorneys' fees).

14.2    Notices.  Unless otherwise provided herein, any notice, tender, or delivery to be given hereunder by any Party to the other shall be deemed effected upon personal delivery in writing, one

Business Day after being dispatched by reputable overnight courier (e.g., FedEx), postage prepaid, or in the case of delivery by facsimile, as of the date of facsimile transmission (with answer back confirmation of such transmission). Notices shall be addressed as set forth below, but each Party may change his address by written notice in accordance with this Section 14.2.

      To either or both of the Selling Parties:

> Harvard Grand Investment, Inc.
> 2 Civic Plaza
> Carson, California 90745
> Attn:  Chang Hung (James) Lee
> Facsimile:  (310) 518-2969
> email: jameslee@gmail.com

      With a copy to (which shall not constitute notice):

> Levene, Neale, Bender, Rankin & Brill L.L.P.
> 10250 Constellation Boulevard
> Suite 1700
> Los Angeles, CA  90067
> Attn:  David B. Golubchik, Esq.
> Facsimile:  (310) 229-1234

> and

> Law Offices of Richard S. Kim & Associates
> 3435 Wilshire Blvd., Suite 2630
> Los Angeles, CA 90010
> Attn. Richard S. Kim, Esq.
> Facsimile:  (213) 365-1225
> Email: rkim@lawrichardkim.com

      To Purchaser:

> Carson Hotel, LLC
> c/o Ensemble Real Estate
> 444 West Ocean Boulevard
> Suite 1108
> Long Beach, California 90802
> Attn:  Mr. Kambiz Babaoff
> Facsimile:  (562) 437-5128

      With a copy to (which shall not constitute notice):

> Pachulski Stang Ziehl & Jones LLP
> 10100 Santa Monica Boulevard
> Eleventh Floor
> Los Angeles, CA  90067
> Attn:  Jeffrey Dulberg, Esq.
> Facsimile:  (310) 201-0760

and

Elkins Kalt Weintraub Reuben & Gartside LLP
1800 Century Park East
Los Angeles, CA  90067
Attn:  Scott M. Kalt, Esq.
Facsimile:  (310) 746-4492

14.3    Entire Agreement.  This Agreement and the documents to be executed pursuant hereto contain the entire agreement between the Parties relating to the sale of the Business.  Any oral representations or modifications concerning this Agreement or any such other document shall be of no force and effect excepting a subsequent modification in writing, signed by the Party to be charged.

14.4    Modification.  This Agreement may be modified, amended or supplemented only by a written instrument duly executed by all the Parties hereto which expressly indicates the intention to modify, amend or supplement this Agreement.

14.5    Severability.  Should any term, provision or paragraph of this Agreement be determined to be illegal or void or of no force and effect, the balance of the Agreement shall survive.

14.6    Captions.  All captions and headings contained in this Agreement are for convenience of reference only and shall not be construed to limit or extend the terms or conditions of this Agreement.

14.7    Further Assurances.  Each Party hereto will execute, acknowledge and deliver any further assurance, documents and instruments reasonably requested by any other Party for the purpose of giving effect to the Contemplated Transactions or the intentions of the Parties with respect thereto.

14.8    Waiver.  No waiver of any of the provisions of this Agreement shall be deemed, or shall constitute, a waiver of other provisions, whether or not similar, nor shall any waiver constitute a continuing waiver.  No waiver shall be binding unless executed in writing by the Party making the waiver; *provided, however*, that the Consent of a Party to the Closing shall constitute a waiver by such Party of any condition precedent to Closing not satisfied as of the Closing Date.

14.9    Payment of Fees and Expenses.  Except as provided in Section 14.1 above, each Party to this Agreement shall be responsible for, and shall pay, all of its own fees and expenses, including those of its counsel, incurred in the negotiation, preparation and consummation of the Agreement and the Contemplated Transactions.

14.10   Survival.  The respective representations and warranties of Purchaser and Seller under this Agreement shall lapse and cease to be of any further force or effect effective upon the Closing.  Except as provided in the immediately preceding sentence, the covenants and agreements of Seller and Purchaser herein, or in any certificates or other documents delivered prior to or at the Closing, shall not be deemed waived or otherwise affected by the Closing.

14.11   Assignments.  This Agreement shall not be assigned by any Party hereto without the prior written consent of the other Party hereto, which consent the Parties may grant or withhold in their sole and absolute discretion, except that Purchaser may assign any or all of its rights or obligations

to any of its Affiliates and may collaterally assign any or all of its rights or obligations hereunder to a lender of Purchaser.

14.12   Binding Effect.   This Agreement shall bind and inure to the benefit of the respective heirs, personal representatives, successors, and assigns of the Parties hereto.

14.13   Applicable Law.   This Agreement shall be governed by and construed in accordance with the Bankruptcy Code and to the extent not inconsistent with the Bankruptcy Code, the law of the State of California applicable to contracts made and performed in such State.

14.14   Construction.   In the interpretation and construction of this Agreement, the Parties acknowledge that the terms hereof reflect extensive negotiations between the Parties and that this Agreement shall not be deemed, for the purpose of construction and interpretation, drafted by either Party hereto.

14.15   CONSENT TO JURISDICTION.   THE PARTIES AGREE THAT THE BANKRUPTCY COURT SHALL BE THE EXCLUSIVE FORUM FOR ENFORCEMENT OF THIS AGREEMENT OR THE CONTEMPLATED TRANSACTIONS AND (ONLY FOR THE LIMITED PURPOSE OF SUCH ENFORCEMENT) SUBMIT TO THE JURISDICTION THEREOF; PROVIDED THAT IF THE BANKRUPTCY COURT DETERMINES THAT IT DOES NOT HAVE SUBJECT MATTER JURISDICTION OVER ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT, THEN EACH PARTY (A) AGREES THAT ALL SUCH ACTIONS OR PROCEEDINGS SHALL BE HEARD AND DETERMINED IN THE SUPERIOR COURT FOR THE COUNTY OF LOS ANGELES, CENTRAL DISTRICT (B) IRREVOCABLY SUBMITS TO THE JURISDICTION OF SUCH COURTS IN ANY SUCH ACTION OR PROCEEDING, (C) CONSENTS THAT ANY SUCH ACTION OR PROCEEDING MAY BE BROUGHT IN SUCH COURTS AND WAIVES ANY OBJECTION THAT SUCH PARTY MAY NOW OR HEREAFTER HAVE TO THE VENUE OR JURISDICTION OR THAT SUCH ACTION OR PROCEEDING WAS BROUGHT IN AN INCONVENIENT COURT, AND (D) AGREES THAT SERVICE OF PROCESS IN ANY SUCH ACTION OR PROCEEDING MAY BE EFFECTED BY MAILING A COPY THEREOF BY REGISTERED OR CERTIFIED MAIL (OR ANY SUBSTANTIALLY SIMILAR FORM OF MAIL), POSTAGE PREPAID, TO SUCH PARTY AT ITS ADDRESS AS PROVIDED IN SECTION 14.2 (PROVIDED THAT NOTHING HEREIN SHALL AFFECT THE RIGHT TO EFFECT SERVICE OF PROCESS IN ANY OTHER MANNER PERMITTED BY CALIFORNIA LAW).

14.16   Counterparts.   This Agreement may be signed in counterparts.   The Parties further agree that this Agreement may be executed by the exchange of facsimile or electronic pdf signature pages provided that by doing so the Parties agree to undertake to provide original signatures as soon thereafter as reasonable in the circumstances.

14.17   Non-Recourse.   No past, present or future stockholder, director, officer, employee, or incorporator of Seller or Purchaser shall have any Liability for any Liability of Seller or Purchaser, as the case may be, under this Agreement or for any claim, counter-claim, cause of action or demand based on, in respect of, or by reason of, the Contemplated Transactions except for any claim against any individual based on the fraud or gross negligence of such individual in connection with any representations of Seller or Purchaser hereunder, as the case may be.

14.18   Time is of the Essence.   Time is of the essence in this Agreement, and all of the terms, covenants and conditions hereof.

14.19    Interpretation and Rules of Construction.  In this Agreement, except to the extent that the context otherwise requires:

(a)    when a reference is made in this Agreement to an Article, Section, Exhibit or Schedule, such reference is to an Article or Section of, or an Exhibit or a Schedule to, this Agreement unless otherwise indicated;

(b)    the headings and captions used in this Agreement are for reference purposes only and do not affect in any way the meaning or interpretation of this Agreement;

(c)    whenever the words "include," "includes" or "including" are used in this Agreement, they are deemed to be followed by the words "without limitation";

(d)    the words "hereof," "herein" and "hereunder" and works of similar import, when used in this Agreement, refer to this Agreement as a whole and not to any particular provision of this Agreement;

(e)    all terms defined in this Agreement have the defined meanings when used in any certificate or other document made or delivered pursuant hereto, unless otherwise defined therein;

(f)    the definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms;

(g)    any law defined or referred to herein or in any agreement or instrument that is referred to herein means such law or statute as from time to time amended, modified or supplemented, including by succession of comparable successor laws;

(h)    references to a person are also to its permitted successors and assigns; and

(i)    the use of "or" is not intended to be exclusive unless expressly indicated otherwise.

14.20    Third Party Beneficiaries.  This Agreement is intended to be solely for the benefit of the Parties hereto and is not intended to confer, and shall not be deemed to confer, any benefits upon, or create any rights in or in favor of, any person or entity other than the Parties hereto, and their respective permitted assigns.

14.21    Headings.  The Section title and headings in this Agreement are and shall be without substantive meaning or context of any kind whatsoever and are for convenience of reference only.

15.    Definitions.  In addition to the other terms defined elsewhere in this Agreement, for the purposes of same, the following words and terms shall have the meaning set forth below (such meanings being equally applicable to both the singular and plural form of the terms defined).  The exhibits and schedules referenced in this Section 15 and throughout the Agreement are deemed to be part of the Agreement and are incorporated herein by reference.

"*Affiliate*" of a Person means a Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, the first-mentioned Person. For purposes of this definition, "control," when used with respect to any specified Person, means the

power to direct or cause the direction of the management and policies of such Person, directly or indirectly, whether through ownership of voting securities or by contract or otherwise, and the terms "controlling" and "controlled by" have meanings correlative to the foregoing.

"*Agreement*" shall have the meaning provided for in the preamble.

"*Allocation Schedule*" shall have the meaning provided for under Section 2.6.

"*Apportionable Operating Expenses*" shall have the meaning provided for under Section 2.5.

"*Assignment of Intangible Property Assets*" shall have the meaning provided for under Section 3.2(f).

"*Assignment of Purchased Contracts*" shall have the meaning provided for under Section 3.2(d).

"*Assumed Liabilities*" shall have the meaning provided for under Section 2.2.

"*Assumption of Liabilities*" shall have the meaning provided for under Section 3.3(e).

"*Avoidance Action*" means all preference or avoidance claims and actions of the Seller, including, without limitation, any such claims and actions arising under Sections 544, 547, 548, 549, and 550 of the Bankruptcy Code.

"*Bank*" shall have the meaning provided for in Recital B.

"*Bankruptcy Code*" shall have the meaning provided for under Recital C.

"*Bankruptcy Court*" shall have the meaning provided for under Recital C.

"*Bill of Sale*" shall have the meaning provided for under Section 3.2(e).

"*Business Day*" means any day other than a Saturday or Sunday or a legal holiday on which banks in Los Angeles, California are closed.

"*Business Permit*" means any business permit, license, certificate of occupancy, registration, certificate of public convenience and necessity, approval, easement, authorization or operating right issued or granted by any Governmental Body having jurisdiction over the Business.

"*Business*" shall have the meaning provided for under Recital A.

"*Cal WARN*" shall have the meaning provided for under Section 11.2.

"*Chapter 11 Case*" shall have the meaning provided for under Recital C.

"*Claim*" means any claim, cause of action, right of recovery, right of set-off, and right of recoupment of every kind and nature including but not limited to prepayments, warranties, guarantees, refunds, reimbursements.

"*Claim Reserve*" shall have the meaning provided for in Section 2.1.

"*Closing*" shall have the meaning provided for under Section 3.1.

"*Closing Date*" shall have the meaning provided for under Section 3.1.

"*Code*" means the Internal Revenue Code of 1986, as amended.

"*Consent*" means any consent, approval, authorization, affirmative vote, waiver, agreement or license by, or report or notice to, any Person.

"*Consigned Inventory*" means all supplies, goods, materials, work in process, inventory and stock in trade held on consignment or memo for a third party.

"*Contemplated Transactions*" shall have the meaning provided for under Recital E.

"*Contract*" means any executory contract or unexpired lease within the meaning of the Bankruptcy Code.

"*Copyright*" means all copyrightable works, and all United States and foreign registered copyrights and applications, registrations and renewals therefor owned by the Seller, and any past, present or future claims or causes of actions arising out of or related to any infringement or misappropriation of any of the foregoing.

"*Cure Cost*" means the amount required to be paid as a cure amount under Section 365 of the Bankruptcy Code so that Seller may sell, assume and assign any Seller's Contract to Purchaser.

"*Deed of Trust*" shall have the meaning provided for in Recital B.

"*Deposits*" shall have the meaning provided for under Section 1.1(d).

"*Domain Name*" means the internet domain names owned by Seller, and all registrations, applications and renewals related to the foregoing.

"*Effective Date*" shall have the meaning provided for in the preamble.

"*Encumbrance*" means any claim, lien, pledge, option, charge, easement, Tax assessment, security interest, deed of trust, mortgage, right-of-way, encroachment, building or use restriction, conditional sales agreement, encumbrance or other right of third parties of any sort whatsoever, whether voluntarily incurred or arising by operation of law, and includes any agreement to give any of the foregoing in the future, and any contingent sale or other title retention agreement or lease in the nature thereof.

"*Entity*" means any corporation (including any non profit corporation), general partnership, limited partnership, limited liability partnership, joint venture, estate, trust, cooperative, foundation, society, political party, union, company (including any limited liability company or joint stock company), firm or other enterprise, association, organization or entity.

"*Environmental Laws*" means all federal, state and local Laws governing health and safety, pollution or the protection of the environment.

"*ERISA*" shall have the meaning provided for under Section 5.17(a).

"*ERISA Affiliate*" shall have the meaning provided for under Section 5.17(a).

"*Excluded Asset*" shall have the meaning provided for under Section 1.2.

"*Excluded Contract*" means any Seller's Contract that becomes an Excluded Contract by operation of Section 1.3.

"*Excluded Liability*": shall have the meaning provided for under Section 2.3.

"*Final Order*" means an Order of the Bankruptcy Court the operation or effect of which has not been stayed, reversed or amended, and as to which Order the time to appeal or to seek review or rehearing has expired and as to which (i) no appeal or request for review or rehearing was filed, or (ii) if an appeal or request for review or rehearing was filed, such appeal or request for review or rehearing is no longer pending.

"*Furniture and Equipment*" means all linens, supplies, beds, laundry and cleaning equipment, restaurant/catering equipment fixtures, artwork, racks, stands, displays, counters, desks, chairs, tables, cubicles and other furniture and furnishings, Hardware, vehicles, tools, and other equipment (copiers, fax machines, telephone lines and numbers, and other telecommunication equipment), and miscellaneous office and store supplies and other items of tangible personal property owned or used by the Seller in the conduct of the Business. As used herein, the Furniture and Equipment does not include any equipment or

other tangible property held by the Seller pursuant to a Contract where Purchaser does not assume the underlying Contract relating to such personal property at the Closing.

"*GAAP*" means United States generally accepted accounting principles, applied on a consistent basis during the periods involved.

"*General Release*" means the mutual general release of Claims between Seller, Purchaser and Lee in the form attached hereto as Exhibit "F".

"*Governmental Body*" means any: (a) nation, principality, state, commonwealth, province, territory, county, municipality, district or other jurisdiction of any nature; (b) federal, state, local, municipal, foreign or other government; (c) governmental or quasi governmental authority of any nature (including any governmental division, subdivision, department, agency, bureau, branch, office, commission, council, board, instrumentality, officer, official, representative, organization, unit, body or Entity and any court or other tribunal); (d) multi-national organization or body; or (e) individual, Entity or body exercising, or entitled to exercise, any executive, legislative, judicial, administrative, regulatory, police, military or taxing authority or power of any nature.

"*Hardware*" means any and all computer and computer-related hardware, including, but not limited to, computers, modems, hard drives, cables, file servers, facsimile servers, scanners, color printers, laser printers and networks.

"*Hazardous Substance*" means any hazardous waste, toxic substance, pollutant or contaminant as those terms are defined in Environmental Laws.

"*Hotel*" shall have the meaning provided for in Recital A.

"*Indebtedness*" means (a) any obligation for borrowed money, including any obligation for accrued and unpaid interest thereon and any prepayment or other penalties or premiums, (b) any capitalized lease obligations, (c) any obligation evidenced by a note, deed, mortgage or secured by any property of Seller, (d) any reimbursement obligations in respect of letters of credit, and (e) all guarantees issued in respect of obligations of any other Person of the type described in clauses (a) through (d).

"*Intangible Property Assets*" means any Intellectual Property Assets or Other Intangible Property owned or held by the Seller. As used in this Agreement, Intangible Property Assets shall in all events exclude: (i) any materials containing information about employees (other than Transferred Employees), disclosure of which is prohibited under applicable law, and (ii) any software or other item of intangible property held by the Seller pursuant to a license or Hotel Contract where Purchaser does not assume the underlying Contract relating to such intangible personal property at the Closing.

"*Intellectual Property Assets*" means intellectual property or other proprietary rights of every kind throughout the world, both domestic and foreign, which, in each case, are related to the Business, including all inventions and improvements thereon, Patents, Trademarks, Domain Names, Trademark Rights, Copyrights, Technology and trade secrets.

"*Inventory*" means all finished and saleable goods, custom printing products, raw materials, inventory in transit, and other items of inventory owned and held by Seller or used in connection with the Business, wherever located.

"*Knowledge*" of a Person means to the best of such Person's knowledge after reasonable inquiry and, with respect to Seller's knowledge, refers to the knowledge of all officers of the Seller.

"*Legal Requirement*" means any applicable federal, state, local, municipal, foreign or other law, statute, legislation, constitution, principle of common law, resolution, ordinance, code, edict, decree, proclamation, treaty, convention, rule, regulation, ruling, directive, pronouncement, requirement, notice requirement, guideline, Order, specification, determination, decision, opinion or interpretation issued,

enacted, adopted, passed, approved, promulgated, made, implemented or otherwise put into effect by or under the authority of any Governmental Body.

"*Letter of Intent*" means the Letter of Intent dated June 7, 2010 between Seller and Purchaser.

"*Liability*" means any direct or indirect liability, Indebtedness, obligation, commitment, expense, claim, deficiency, guaranty or endorsement of any type whatsoever, whether accrued or unaccrued, absolute or contingent, matured or unmatured, liquidated or unliquidated, known or unknown, asserted or unasserted, due or to become due.

"*LNBRB*" means Levene, Neale, Bender, Rankin & Brill L.L.P., counsel to Seller.

"*Loan Agreement*" shall have the meaning provided for in Recital B.

"*Loan Documents*" shall have the meaning provided for in Recital B.

"*Material Adverse Effect*" means any material adverse effect on or change with respect to the business, operations, assets, Liabilities, financial condition, results of operations, properties or prospects of Seller or the Business, taken as a whole, or any material adverse effect on the ability of Seller to consummate the Contemplated Transactions or perform its obligations under this Agreement, in each case other than (i) the effect of any change in the United States or foreign economies or securities or financial markets in general; (ii) the effect of any change arising out of or resulting from the filing of the Petition; or (iii) the effect of any change arising out of or resulting from the announcement or pendency of the Contemplated Transactions.

"*Note*" shall have the meaning provided for in Recital B.

"*Order*" means any judgment, decision, consent decree, injunction, ruling or order of any Governmental Body that is binding on any Person or its property under applicable law.

"*Other Contracts*" means any Seller's Contract other than a Personal Property Lease.

"*Other Intangible Property Assets*" means all intangible personal property (other than the Intellectual Property Assets) owned or held by Seller, including, without limitation, (A) the books and records pertaining to the Business; (B) proprietary information relating to the Business, including but not limited to catalogues, customer lists and other customer data bases, correspondence with present or prospective customers and suppliers, advertising materials, software programs, and telephone exchange numbers identified with the Business; and (C) all goodwill of the Business.

"*Outside Date*" means June 30, 2010.

"*Party*" shall have the meaning provided for in the preamble.

"*Patent*" means the United States patents and patent applications owned by the Seller, including, any continuations, divisionals, continuations in part, or reissues of patent applications and patents issuing thereon and any past, present or future claims or causes of action arising out of or related to any infringement or misappropriation of any of the foregoing.

"*Person*" means an individual, Entity or Governmental Body.

"*Personal Property Lease*" means any Seller's Contract that is a lease or license of equipment or other personal property, tangible or untangible.

"*Petition Date*" shall have the meaning provided for in Recital C.

"*Petition*" shall have the meaning provided for under Recital C.

"*Purchase Price*" shall have the meaning provided for under Section 2.1.

"*Purchased Assets*" shall have the meaning provided for under Section 1.1.

"*Purchased Contract*" means any Seller's Contract that is designated by Purchaser as a Purchased Contract under Section 1.3.

"*Purchased Furniture and Equipment*" shall have the meaning provided for under Section 1.1(b).

"*Purchased Inventory*" shall have the meaning provided for under Section 1.1(c).

"*Purchased Real Property*" shall have the meaning provided for in Section 1.1(a).

"*Purchaser*" shall have the meaning provided for in the preamble.

"*Receivables*" shall have the meaning provided under Section 1.1(g).

"*Sale Approval Order*" shall have the meaning provided for under Section 8.

"*Sale Motion*" shall have the meaning provided for under Section 8.

"*Security Agreement*" shall have the meaning provided for in Recital B.

"*Seller Benefit Plan*" shall have the meaning provided for under Section 5.17(g).

"*Seller's Contract*" means any Contract (a) to which Seller is a party or by which Seller is bound and (b) that is related to the Business.

"*Seller's Financial Statements*" shall have the meaning provided for under Section 5.7.

"*Seller's Required Approval*" shall have the meaning provided for under Section 5.4.

"*Seller*" shall have the meaning provided for in the preamble.

"*Subsidiary*" means, with respect to any Person, (a) any corporation of which at least 50% of the securities or interests having, by their terms, ordinary voting power to elect members of the board of directors, or other persons performing similar functions with respect to such corporation, is held, directly or indirectly by such Person and (b) any partnership or limited liability company of which (i) such Person is a general partner or managing member or (ii) such Person possesses a 50% or greater interest in the total capitalization or total income of such partnership or limited liability company.

"*Tax*" means any federal, state, local or foreign income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental, customs duties, capital stock, franchise, profits, withholding, social security, unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, including any interest, penalty, or addition thereto, whether disputed or not.

"*Tax Return*" means any return, declaration, report, claim for refund, transfer pricing report or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"*Technology*" means, collectively, all designs, formulae, algorithms, procedures, methods, techniques, know how, research and development, technical data, programs, subroutines, tools, materials, specifications, processes, inventions (whether patentable or unpatentable and whether or not reduced to practice), apparatus, creations, improvements, works of authorship and other similar materials, and all recordings, graphs, drawings, reports, analyses, and other writings, and other tangible embodiments of the foregoing, in any form whether or not specifically listed herein, and all related technology.

"*Trademark*" means all trademark registrations and applications for trademark registration owned by Seller, together with the goodwill associated with any of the foregoing, and all applications, registrations and renewals thereof, and any past, present or future claims or causes of action arising out of or related to any infringement or misappropriation of any of the foregoing.

"*Trademark Rights*" means all common law rights in the United States in any Trademarks, trade names, corporate names, logos, slogans, designs, trade dress, and unregistered trademarks and service marks owned by Seller, together with all translations, adaptations, derivations and combinations thereof, and the goodwill associated with any of the foregoing.

"*Transfer Taxes*" shall have the meaning provided for under Section 3.4.

"*Transferred Employee*" means any employee of Seller, upon accepting an offer of employment from Purchaser.

"*Unsecured Claims Account*" shall have the meaning provided for under Section 3.3(b).

"*Utilities*" shall have the meaning provided for under Section 2.5.

"*WARN Act*" means the United States Worker Adjustment and Retraining Notification Act, and the rules and regulations promulgated thereunder.

"*Warranty Deed*" shall have the meaning provided for in Section 3.2(c).

IN WITNESS WHEREOF, Purchaser and Seller have executed this Agreement as of the day and year first above written.

**PURCHASER:**

Carson Hotel, LLC,
a Delaware limited liability company

By:      _____
Name:  _____
Its:      _____

**SELLER:**

Harvard Grand Investment, Inc.,
a California corporation

By:      _____
Name:          Chang Han (James) Lee
Its:             Chairman

## CONSENT OF THE UNDERSIGNED

The undersigned agree to comply with the obligations of the undersigned set forth in Section 3.3(b) of this Agreement.

LEVENE, NEALE, BENDER, RANKIN & BRILL L.L.P.

By:_____
Name:_____
Title:_____

## EXHIBITS AND SCHEDULES

### EXHIBITS

| | |
|---|---|
| A | Assignment and Assumption of Leases and Contracts |
| B | Bill of Sale and Assignment |
| C | Assignment of Intangible Property Assets |
| D | Assumption Agreement |
| E | Sale Approval Order |
| F | General Release |
| G | Real Property Legal Description |
| H | Interim Alcohol Beverage Agreement |

### SCHEDULES

| | |
|---|---|
| Schedule 2.1 | Calculation of Cash Purchase Price |
| Schedule 2.2 | Assumed Liabilities |
| Schedule 5.3 | Seller's Required Approvals |
| Schedule 5.7 | Seller's Financial Statement |
| Schedule 5.9 | Assets Off Premises |
| Schedule 5.10 | Interest of any Seller Affiliate in Business |
| Schedule 5.12(a) | Purchased Furniture and Equipment and Inventory |
| Schedule 5.12(b) | Deposits |
| Schedule 5.12(c) | Receivables of Seller |
| Schedule 5.12 (d) | Advanced Bookings |
| Schedule 5.14(a) | Personal Property Leases |
| Schedule 5.14(b) | Other Contracts |
| Schedule 5.14(d) | Cure Costs |
| Schedule 5.15 | Business Permits |
| Schedule 5.16(a) | Employee Information |
| Schedule 5.16(e) | Former Employees who are M&A qualified beneficiaries |
| Schedule 5.19 | Insurance Policies |

Exhibit "A"

## ASSIGNMENT AND ASSUMPTION OF LEASES AND CONTRACTS

This Assignment and Assumption of Leases and Contracts (this "*Assignment*") is entered into as of this ___th day of _____, 2010, by and between Harvard Grand Investment, Inc., a California corporation ("*Seller*" or "*Assignor*"), and Carson Hotel, Inc., a Delaware limited liability company ("*Assignee*").

Assignor and Assignee acknowledge that:

A.      Assignor is a debtor and debtor in possession in chapter 11 proceedings before the United States Bankruptcy Court for the Central District of California, Los Angeles Division.

B.      Assignor, as Seller, and Assignee, as Purchaser, have heretofore entered into that certain Asset Purchase Agreement dated as of June 21, 2010 (the "*Purchase Agreement*"). Except for terms specifically defined herein, the capitalized terms used in this Assignment shall have the same meanings as capitalized terms used in the Purchase Agreement.

C.      Concurrently with the mutual execution and delivery of this Assignment, Assignor and Assignee are consummating the Contemplated Transactions. Assignor and Assignee are executing and delivering this Assignment in satisfaction of their respective obligations pursuant to Sections 3.2(d) and 3.3(d) of the Purchase Agreement.

NOW, THEREFORE, for good and valuable consideration, the receipt and adequacy of which Assignor and Assignee hereby acknowledge, Assignor and Assignee hereby agree as follows:

1.      Assignment. Effective as of the Closing Date, Assignor hereby assigns to Assignee all of its right, title and interest in and to the Purchased Contracts.

2.      Assumption. Effective as of the Closing Date, Assignee hereby accepts the foregoing assignment and assumes and agrees to be bound by the terms and provisions of the Purchased Contracts and to perform all of Assignor's obligations thereunder to be performed from and after the Closing Date as though Assignee had been the original contracting party thereunder.

3.      Amendments. This Assignment may only be amended by a writing signed by both Assignors and Assignee.

4.      Execution in Counterparts. This Assignment may be executed in counterparts and delivered by the delivery of facsimile signatures; *provided, however*, that if the Parties exchange facsimile or electronic pdf signatures, each of them agrees to provide the other with a copy of this Assignment bearing their original signature promptly thereafter.

5.      Delivery Pursuant to Purchase Agreement. Notwithstanding anything to the contrary herein, Assignor and Assignee are executing and delivering this Assignment in accordance with and subject to all of the terms and provisions of the Purchase Agreement (including, without limitation, the acknowledgement and disclaimer set forth in Section 7 of the Purchase Agreement).

6.      Further Assurances.    Assignor covenants and agrees to execute and deliver further instruments of transfer and assignment and take such other action as Purchaser may reasonably request to more effectively transfer and assign to and vest in Purchaser the Purchased Contracts.

7.      Governing Law.   This Assignment shall be governed by and construed and enforced in accordance with the laws of the State of California.

IN WITNESS WHEREOF, Assignor and Assignee have executed this Assignment as of the day and year first set forth above.

**ASSIGNOR:**

Harvard Grand Investment, Inc.,
a California corporation,
Chapter 11 Debtor and Debtor in Possession

By: _____

Name: _____

Its: _____

**ASSIGNEE:**

Carson Hotel, LLC,
a Delaware limited liability company

By: _____

Name: _____

Its: _____

Exhibit "B"

## BILL OF SALE AND ASSIGNMENT

Reference is hereby made to that certain Asset Purchase Agreement, dated June ____, 2010 (the "*Purchase Agreement*"), by and between Harvard Grand Investment, Inc., a California corporation ("*Seller*"), and Carson Hotel, LLC, a Delaware limited liability company ("*Purchaser*"). Except for terms specifically defined in this Bill of Sale, all capitalized terms used in herein shall have the same meanings as such terms have when utilized in the Purchase Agreement. Seller is a Chapter 11 Debtor and Debtor in Possession in the Chapter 11 Case.

For good and valuable consideration, the receipt and sufficiency of which Seller hereby expressly acknowledges, Seller hereby sells, transfers, assigns and delivers to Purchaser all of its right, title and interest in and to the Purchased Assets.

Seller covenants and agrees to execute and deliver further instruments of transfer and assignment and take such other action as Purchaser may reasonably request to more effectively transfer and assign to and vest in Purchaser the Purchased Assets.

Notwithstanding anything to the contrary herein, Seller is executing and delivering this Bill of Sale and Assignment in accordance with and subject to all of the terms and provisions of the Purchase Agreement (including, without limitation, the acknowledgement and disclaimer set forth in Section 7 of the Purchase Agreement).

**IN WITNESS WHEREOF**, Seller has caused this Bill of Sale and Assignment to be executed as of the _____ day of _____, 2010.

**Seller:**

Harvard Grand Investment, Inc.,
a California corporation,
Debtor and Debtor in Possession

By:      _____
Name:  _____
Its:       _____

**Exhibit "C"**

## ASSIGNMENT OF INTANGIBLE PROPERTY ASSETS

Harvard Grand Investment, Inc., a California corporation ("*Assignor*"), is executing this Assignment of Intangible Property Assets (this "*Assignment*") in favor of Carson Hotel, LLC, a Delaware limited liability company (the "*Assignee*"), with respect to the following facts and circumstances:

(A)      Assignor and Assignee have heretofore entered into that certain Asset Purchase Agreement dated as of June 21, 2010 (the "*Purchase Agreement*"). Except for terms specifically defined in this Assignment, the capitalized terms used in this Assignment shall have the same meanings as such terms when used in the Purchase Agreement.

(B)      Concurrently with the execution and delivery of this Assignment, Assignor and Assignee are consummating the Contemplated Transactions. Pursuant to the Purchase Agreement, Assignor is required to execute and deliver this Assignment at the Closing.

**NOW, THEREFORE, FOR GOOD AND VALUABLE CONSIDERATION**, the receipt and sufficiency of which Assignor hereby expressly acknowledges, assigns, conveys, transfers and sets over unto Assignee, all of its right, title and interest, if any, in and to all Intangible Property Assets. This Assignment shall inure to the benefit of, and be binding upon, the successors, executors, administrators, legal representatives and assigns of Assignor and Assignee.

Notwithstanding anything to the contrary herein, Assignor is executing and delivering this Assignment in accordance with and subject to all of the terms and provisions of the Purchase Agreement (including, without limitation, the acknowledgement and disclaimer set forth in Section 7 of the Purchase Agreement).

Assignor covenants and agrees to execute and deliver further instruments of transfer and assignment and take such other action as Assignee may reasonably request to more effectively transfer and assign to and vest in Assignee the Intangible Property Assets.

This Assignment shall be governed by and construed and enforced in accordance with the laws of the State of California.

**IN WITNESS WHEREOF**, Assignor and Assignee have executed this Assignment as of the ____ day of _____, 2010.

### ASSIGNOR:

Harvard Grand Investment, Inc.,
a California corporation,
Debtor and Debtor in Possession

By: _____

Name: _____

Its: _____

### ASSIGNEE:

Carson Hotel, LLC,
a Delaware limited liability company

By: _____

Name: _____

Its: _____

Exhibit "D"

## ASSUMPTION AGREEMENT

This Assumption Agreement (this "*Assumption*") is entered into as of this ____ day of _____, 2010, by Carson Hotel, LLC, a Delaware limited liability company (the "*Purchaser*") in favor of Harvard Grand Investment, Inc., a California corporation ("*Seller*"). This Assumption is entered into with respect to the following facts and circumstances:

A.    Seller and Purchaser have heretofore entered into that certain Asset Purchase Agreement dated June 21, 2010 (the "*Purchase Agreement*"). Except for terms specifically defined herein, the capitalized terms used in this Assumption shall have the same meanings as capitalized terms used in the Purchase Agreement.

B.    Seller is a Chapter 11 Debtor and Debtor in Possession under Case No. 2:10-bk-31833-BR in the Bankruptcy Court.

C.    Concurrently with the execution and delivery of this Assumption, Purchaser and Seller are consummating the Contemplated Transactions.

NOW, THEREFORE, for good and valuable consideration, the receipt and adequacy of which Purchaser hereby acknowledges, Purchaser hereby agrees as follows:

1.    Assumption. Effective as of the Closing Date, Purchaser hereby assumes and agrees to perform all of the Assumed Liabilities in accordance with their terms as expressed in the Purchase Agreement.

2.    Amendments. This Assumption may only be amended by a writing signed by both Purchaser and Seller.

3.    Governing Law. This Assumption shall be governed by and construed and enforced in accordance with the laws of the State of California.

4.    Execution in Counterparts. This Assumption may be executed in counterparts and delivered by the delivery of facsimile signatures; *provided, however*, that if the Parties exchange facsimile or electronic pdf signatures, each of them agrees to provide the other with a copy of this Assumption bearing their original signature promptly thereafter.

     IN WITNESS WHEREOF, Purchaser has executed this Assumption as of the day and year first set forth above.

**PURCHASER:**

Carson Hotel, LLC,
a Delaware limited liability company

By:       _____

Name:    _____

Its:       _____

Exhibit D, Page 2

**Exhibit "E"**

## <u>SALE APPROVAL ORDER</u>

TIMOTHY J. YOO (State Bar No. 155531)
DAVID B. GOLUBCHIK (State Bar No. 185520)
JULIET Y. OH (State Bar No. 211414)
LEVENE, NEALE, BENDER, RANKIN & BRILL L.L.P.
10250 Constellation Boulevard, Suite 1700
Los Angeles, California 90067
Telephone: (310) 229-1234
Facsimile: (310) 229-1244
Emails: tjy@lnbrb.com; dbg@lnbrb.com; jyo@lnbrb.com

Proposed Attorneys for Debtor and Debtor in Possession

### UNITED STATES BANKRUPTCY COURT

### CENTRAL DISTRICT OF CALIFORNIA

### LOS ANGELES DIVISION

| | |
|---|---|
| In re: | ) Case No.: 2:10-bk-31833-BR |
| | ) |
| HARVARD GRAND INVESTMENT, | ) Chapter 11 Case |
| INC., | ) |
| | ) **ORDER:    (A)    APPROVING** |
| Debtor and Debtor in Possession, | ) **COMPROMISE OF CONTROVERSY** |
| | ) **BETWEEN DEBTOR AND SECURED** |
| | ) **CREDITOR; (B) AUTHORIZING THE** |
| | ) **SALE OF SUBSTANTIALLY ALL OF** |
| | ) **THE DEBTOR'S ASSETS FREE AND** |
| | ) **CLEAR    OF    LIENS,    CLAIMS,** |
| | ) **ENCUMBRANCES AND INTERESTS;** |
| | ) **(C)    AUTHORIZING    THE** |
| | ) **ASSUMPTION AND ASSIGNMENT OF** |
| | ) **CERTAIN EXECUTORY CONTRACTS** |
| | ) **AND UNEXPIRED LEASES; AND (D)** |
| | ) **GRANTING RELATED RELIEF** |
| | ) |
| | ) |
| | ) |
| | ) Hearing: |
| | ) Date:   June 22, 2010 |
| | ) Time:   10:00 a.m. |
| | ) Place:   255 East Temple Street |
| | )           Courtroom 1668 |
| | )           Los Angeles, CA 90012 |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |

A hearing was held on June 22, 2010, at 10:00 a.m., before the Honorable Barry Russell, United States Bankruptcy Judge, to consider the Motion (the "Motion") For Order (A) Approving Compromise Of Controversy Between Debtor And Secured Creditor; (B) Authorizing The Sale ("Sale") Of Substantially All Of The Debtor's Assets (the "Assets") Free And Clear Of Liens, Claims, Encumbrances And Interests; (C) Authorizing The Assumption And Assignment Of Certain Executory Contracts And Unexpired Leases (the "Contracts"); And (D) Granting Related Relief, filed by Harvard Grand Investment, Inc., a California corporation, the debtor and debtor in possession in the above-captioned chapter 11 bankruptcy case (the "Debtor"). Appearances were as set forth on the Court's record.

After carefully reviewing the Motion and such other matters in the file as the Court deemed appropriate, after receiving and weighing the testimony and other evidence offered at the hearing on the Motion, after hearing the statements and representations of counsel and all persons who desired to be heard at the hearing on the Motion, and after considering such other and further matters as the Court deemed appropriate, the Court hereby

### ORDERS AND DECREES AS FOLLOWS:

1.      The Motion is granted.

2.      As evidenced by the declarations of service previously filed with this Court, proper, timely, adequate and sufficient notice of the Motion and the hearing thereon and the proposed Sale has been provided in accordance with 11 U.S.C. §§ 102(1) and 363 and Bankruptcy Rules 2002, 6004 and 6005, and no other or further notice of the Motion, the hearing or of the entry of this order is required.

3.      Each and every term and provision of this Order shall be binding in all respects upon the Debtor, the Debtor's bankruptcy estate, its creditors, and all entities holding an interest

in the Debtor, including, without limitation, any entity purporting to hold an Interest in the Assets.

4.    The Asset Purchase and Settlement Agreement (the "APA"), a copy of which is attached hereto as Exhibit "__", and all of the terms and conditions thereof are hereby approved.

5.    The Debtor has demonstrated that approval of the APA and the sale of the Assets contemplated thereunder is in the best interests of the estate and its creditors.  The Debtor has advanced good and sufficient business justification supporting the sale of the Assets pursuant to 11 U.S.C. § 363(b), as set forth in the Motion and at the hearing thereon, and it is a reasonable exercise of the Debtor's business judgment.  Pursuant to 11 U.S.C. § 363(b), the Debtor is authorized and directed to consummate the Sale pursuant to and in accordance with the terms and conditions of the APA.

6.    The APA was negotiated, proposed and entered into in a non-collusive, good faith, "arm's-length" manner by the Debtor and Carson Hotel, LLC ( "Purchaser").

7.    The sale of the Assets in accordance with the terms of the APA constitutes the highest and best proposal for the Assets received by the Debtor.

8.    The Debtor is authorized and directed to execute and deliver, and is empowered to perform under, consummate and implement, the APA, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the APA, including, without limitation, all other agreements that the parties may enter into to effectuate a transition of the business operations to Purchaser, and to take all further actions as may be requested by Purchaser for the purpose of assigning, transferring, granting, conveying and conferring to Purchaser or reducing to possession, the Assets, or as may be necessary or appropriate to the performance of the obligations as contemplated by the APA.

9.     Pursuant to 11 U.S.C. §§ 105(a), 363(b), and 363(f), the Assets shall be transferred to Purchaser and, as of the Closing Date, shall be free and clear of all liens, claims, interests and encumbrances (excluding (a) any real property taxes and easements relating to the Hotel and (b) Interests held by Purchaser as the holder in due course of that certain [DESCRIBE AND DEFINE NOTE AND DEED OF TRUST]) (collectively, "Interests"), with all such Interests of any kind or nature whatsoever attaching to the net proceeds of the Sale in the order of their priority, with the same validity, force and effect which they now have as against the Assets, subject to any claims and defenses, if applicable, the Debtor may possess with respect thereto. Those holders of Interests who did not object to the Motion are deemed to have consented pursuant to 11 U.S.C. § 363(f)(2).  Those holders of Interests who did object are adequately protected by having their Interests, if any, attach to the proceeds of the Sale, with the same validity and priority as existed prior to the sale.

10.    Except as expressly permitted or otherwise specifically provided by the APA or this Order, all persons and entities (including, but not limited to, all equity security holders, governmental, tax and regulatory authorities, lenders, trade and other creditors) holding Interests of any kind or nature whatsoever in or against the Debtor or the Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, senior or subordinated), arising under, out of, in connection with, or in any way relating to the Debtor or the Assets, the operation of the Debtor's business prior to the Closing Date, or the transfer of the Assets to Purchaser, shall be and hereby are forever barred and estopped from asserting against Purchaser, its successors or assigns, its property, or the Assets, such persons' or entities' Interests.

11.     The transfer of the Assets to Purchaser pursuant to the APA constitutes a legal, valid and effective transfer of the Assets, and shall vest Purchaser with all right, title and interest of the Debtor in and to the Assets free and clear of all Interests of any kind or nature whatsoever, and the assertion of any such Interests in or against the Assets shall be and hereby is prohibited.

12.     At Closing, Purchaser shall pay the Purchase Price, as described and in a manner provided under the APA.

13.     The Contracts assumed by the Debtor and assigned to Purchaser at Closing, pursuant to this Order, shall consist of those Contracts designated by Purchaser pursuant to that certain [NOTICE OF ASSIGNED CONTRACTS], as such Contracts may be modified by Purchaser designating the addition or deletion of Contracts pursuant to and in accordance with the APA.

14.     Pursuant to 11 U.S.C. §§ 105(a) and 365, and subject to and conditioned upon the further terms of this Order and the Closing of the Sale, the Debtor's assumption and assignment to Purchaser on the terms set forth in the APA, of all Contracts is approved, and the requirements of 11 U.S.C. § 365(b)(1) with respect thereto are deemed satisfied.

15.     Except as provided in this Order, the Debtor is hereby authorized and directed, in accordance with 11 U.S.C. §§ 105(a) and 365, to (a) assume and assign to Purchaser, effective upon the Closing of the Sale, all Contracts free and clear of all Interests of any kind or nature whatsoever, and (b) execute and deliver to Purchaser such documents or other instruments as may be necessary to assign and transfer such Contracts to Purchaser.

16.     The Contracts shall be transferred to, and remain in full force and effect for the benefit of, Purchaser in accordance with their respective terms, notwithstanding any provision in any such Contract that prohibits, restricts, or conditions such assignment or transfer, and,

pursuant to 11 U.S.C. § 365(k), the Debtor shall be relieved from any further liability with respect to such Contracts after their assignment to and assumption by Purchaser.

17.    All defaults or other obligations of the Debtor under the Contracts arising or accruing prior to the date of this Order (without giving effect to any acceleration clauses or any default provisions of the kind specified in 11 U.S.C. § 365(b)(2)) and all compensation for damages with respect to the Contracts (the "Cure Claims") shall be cured at the Closing of the Sale in the amounts set forth in Exhibit "__" hereto, and Purchaser shall have no liability or obligation arising or accruing with respect to Cure Claims.

18.    Each non-Debtor party to a Contract is hereby forever barred and estopped from asserting against the Debtor, Purchaser, the Assets, or the property of either of them, any default existing as of the Closing Date or, as against Purchaser, any counterclaim, defense, setoff or any other claim asserted or assertable against the Debtor with respect to the Contract.  Subsequent to the Closing, no claims other than Cure Claims may be asserted against the Debtor with respect to the Contracts.

19.    The failure of the Debtor or Purchaser to enforce, at any time, one or more terms or conditions of any Contract shall not be a waiver of such terms or conditions, or of the Debtor's and Purchaser's rights to enforce every term and condition of the Contracts.

20.    Any objections to Cure Amounts (the "Cure Amount Objections") with respect to a particular Contract shall be resolved as follows:

(a)    The Contract shall be assumed and assigned to Purchaser immediately upon the Closing;

(b)     Within thirty (30) days after the Closing, the Debtor and the non-Debtor party to each such Contract shall attempt to negotiate a resolution of the dispute (the "Negotiation Phase");

(c)     If the parties are unable to resolve their dispute during the Negotiation Phase, either party may request the Court to set the objection for hearing before the Court on no less than fourteen (14) days notice.

21.     The consideration provided by Purchaser for the Assets under the APA constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the State of California.

22.     The consideration provided by Purchaser for the Assets under the APA is fair and reasonable and the Sale may not be avoided under 11 U.S.C. § 363(n).

23.     On the Closing Date of the Sale, each holder of an Interest shall execute such documents and take all other actions as may be necessary to release such Interest, if any, in the Assets and to give Purchaser clear title to the Assets. If any holder of an Interest fails or refuses to do so, Purchaser is hereby granted a lifetime power of attorney to act on such creditor's behalf, but only to the extent necessary to take any such action.

24.     This Order (a) shall be effective as a determination that, on the Closing Date, all Interests of any kind or nature whatsoever existing as to the Assets prior to the Closing have been unconditionally released, discharged and terminated (other than the Assumed Liabilities), and that the conveyances described herein have been effected, and (b) shall be binding upon and shall govern the acts of all entities including without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise

record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the Assets.

25.    Each and every federal, state and local governmental agency or department is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the APA.

26.    If any person or entity that has filed financing statements, mortgages, mechanic's liens, lis pendens, or other documents or agreements evidencing Interests in the Assets shall not have delivered to the Debtor, prior to the Closing Date, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of all Interests which the person or entity has with respect to the Assets, then (a) the Debtor is authorized and directed to execute and file such statements, instruments, releases and other documents on behalf of the person or entity with respect to the Assets and (b) Purchaser is authorized to file, register, or otherwise record a certified copy of this Order, which, once filed, registered or otherwise recorded, shall constitute conclusive evidence of the release of all Interests in the Assets of any kind or nature whatsoever.

27.    All entities who are presently, or on the Closing Date may be, in possession of some or all of the Assets are hereby directed to surrender possession of the Assets to Purchaser on the Closing Date.

28.    Except as otherwise specifically provided herein or in the APA, Purchaser shall have no liability or responsibility for any liability or other obligation of the Debtor arising under or related to the Assets. Without limiting the generality of the foregoing, and except as otherwise specifically provided herein and in the APA, Purchaser shall not be liable for any claims against the Debtor, or any of its predecessors or affiliates, except as set forth in the APA as Assumed Liabilities, and Purchaser shall have no successor or vicarious liabilities of any kind or character, whether known or unknown as of the Closing Date, now existing or hereafter arising, whether fixed or contingent, with respect to the Debtor or any obligations of the Debtor arising prior to the Closing Date, including, but not limited to, liabilities on

Exhibit E, Page 9

account of any taxes arising, accruing, or payable under, out of, in connection with, or in any way relating to the transfer of the Assets or the operation of the Debtor's business prior to the Closing Date.

29.     Under no circumstances shall Purchaser be deemed a successor of, or to, the Debtor for any Interest in or against the Debtor or the Assets, of any kind or nature whatsoever. The sale, transfer, assignment and delivery of the Assets shall not be subject to any Interests, and Interests of any kind or nature whatsoever shall remain with, and continue to be obligations of, the Debtor. All persons holding Interests in or against the Debtor or the Assets, of any kind or nature whatsoever, shall be and hereby are forever barred and estopped from asserting, prosecuting, or otherwise pursuing such Interests against Purchaser, its property, its successors and assigns, or the Assets with respect to any Interests of any kind or nature whatsoever such person or entity had, has, or may have in or against the Debtor, its estate, officers, directors, shareholders or the Assets. Following the Closing Date, no holder of any Interests in or against the Debtor shall interfere with Purchaser's title to, or use and enjoyment of, the Assets based on or related to such Interests.

30.     The compromise of controversies set forth in the APA, and all of the transactions contemplated thereby, are approved in their entirety pursuant to Bankruptcy Rule 9019 as complying with all factors set forth in Martin v. Kane (*In re* A & C Properties), 784 F.2d 1377, 1380-81 (9th Cir. 1986), cert. denied 479 U.S. 854 (1986).

31.     This Court retains jurisdiction to enforce and implement the terms and provisions of this Order, the APA, all amendments thereto, any waivers and consents thereunder, and of each of the agreements executed in connection therewith in all respects, including, but not limited to, retaining jurisdiction (a) to compel delivery of the Assets to Purchaser, (b) to resolve any disputes arising under or related to the APA, (c) to interpret, implement, and enforce the provisions of the Order, (d) to resolve any and all Contract Assumption Objections, and (e) to protect Purchaser against any Interests in or against Purchaser or the Assets, of any kind or nature whatsoever.

32.     Nothing contained in any plan of reorganization confirmed in this case or any order of this Court confirming such plan shall conflict with or derogate from the provisions of the APA or the terms of this Order. The provisions of this Order and any actions taken pursuant hereto shall survive the entry of any order which may be entered converting the Debtor's case from Chapter 11 to a case under Chapter 7 of Title 11.

33.     The transactions contemplated by the APA are undertaken by Purchaser in good faith, as that term is used in 11 U.S.C. § 363(m) and, accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the Sale to Purchaser, unless the Closing of the Sale is duly stayed pending such appeal. Purchaser is a purchaser in good faith of the Assets, and is entitled to all of the protections afforded by 11 U.S.C. § 363(m).

34.     The terms and provisions of the APA and this Order shall be binding in all respects upon, and shall inure to the benefit of, the Debtor, its estate, its creditors and equity security holders, Purchaser, and its respective affiliates, designees, successors and assigns, and any affected third parties including, but not limited to, all persons asserting Interests in the Assets to be sold to Purchaser pursuant to the APA, notwithstanding any subsequent appointment of any trustee(s), examiner or similar person under any chapter of the Bankruptcy code, as to which trustee(s), examiner or other such person such terms and provisions likewise shall be binding.

35.     The failure specifically to include any particular provisions of the APA in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the APA be authorized and approved in its entirety. To the extent any provision of the APA is inconsistent with the terms of this Order, the terms of this Order shall govern.

36.     The APA and any related agreements, documents or other instruments may be modified, amended or supplemented by the parties thereto, in a writing signed by both parties, and in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment or supplement does not have a material adverse effect on the Debtor's estate.

37.     As provided by Bankruptcy Rule 7062, this Order shall be effective and enforceable immediately upon entry, and, as authorized by Bankruptcy Rules6004(h) and 6006(d), this Order shall not be stayed.

38.     The provisions of this Order are non-severable and mutually dependent.

39.     Except as provided in the APA, this Order or any other order of this Court, the Debtor and its estate shall have no further liabilities or obligations with respect to the Assumed Liabilities after the Closing, and all holders of such claims are forever barred and estopped from asserting such claims against the Debtor, its successors or assigns, its property or its assets.

**IT IS SO ORDERED.**

# # #

Exhibit "F"

## MUTUAL GENERAL RELEASE

This Mutual General Release (this "*Release*"), dated as of _____ _____, 2010, has been entered into by and among (a) Harvard Grand Investment, Inc., a California corporation and Chapter 11 debtor and debtor in possession ("*Seller*"), (b) Chang Hun (James) Lee, an individual resident of California ("*Lee*"), (c) Carson Hotel, LLC, a Delaware limited liability company ("*Purchaser*"). In this Agreement, Seller and Lee are referred to as the "*Selling Parties*."

WHEREAS, Seller is the maker of a Promissory Note dated on or about September 26, 2007 in the original principal amount of $22,260,000 (the "*Note*") in favor of Shinhan Bank America, for itself and as agent for the lenders identified therein (the "*Bank*"). The Note was issued pursuant to a Business Loan Agreement on or about September 26, 2007 between Seller, as borrower, and the Bank (as amended, the "*Loan Agreement*"). The obligations of Seller under the Note and the Loan Agreement are secured by a security interest in all of the assets of Seller pursuant to a Commercial Security Agreement dated on or about September 26, 2007 between Seller, as debtor, and the Bank, as secured party (the "*Security Agreement*" and, together with the Note and the Loan Agreement, the "*Loan Documents*"), and a deed of trust on the real property underlying the Hotel, recorded in the property records of the County of Los Angeles as document number 20072238021 (the "*Deed of Trust*").

WHEREAS, Lee is a principal of Seller and a guarantor of the indebtedness of Seller under the Loan Documents pursuant to the terms of a guaranty (the "*Lee Guaranty*");

WHEREAS, the Purchaser has acquired and is the holder of all of the Bank's right, title and interest in and to the Loan Documents.

WHEREAS, Seller is a debtor and debtor in possession in voluntary proceedings under chapter 11 of title 11 of the United States Code pending in the United States Bankruptcy Court for the Central District of California, Los Angeles Division;

WHEREAS, Seller and Purchaser are parties to an Asset Purchase Agreement, dated as of June 21, 2010 (as amended, supplemented or otherwise modified from time to time, the "*Asset Purchase Agreement*"), relating to, among other things, the sale by Seller, and purchase by Purchaser, of certain assets and properties of Seller relating to the Business (as defined in the Asset Purchase Agreement), all in the manner and subject to the terms and conditions set forth in the Asset Purchase Agreement and in accordance with Sections 105, 363 and 365 of the Bankruptcy Code; and

WHEREAS, pursuant to the Asset Purchase Agreement, and in connection with the consummation of the transactions contemplated thereby, the Parties are entering into this General Release;

NOW, THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.      Definitions. As used in this Release, the following terms have the respective meanings set forth below:

"Claims" shall mean any and all claims, causes of action, damages, losses, liabilities, obligations, expenses, debts, dues, sums of money, accounts, reckonings, contracts, controversies, agreements, promises and demands of any and every character, kind and nature whatsoever, whether known or unknown, fixed or contingent, direct or indirect, accrued or not accrued, liquidated or unliquidated or suspected or unsuspected, in contract or in tort or otherwise, and regardless of the legal, contractual or equitable basis thereof, including but not limited to any such claims, causes of action, damages, losses, liabilities, expenses, debts, dues, sums of money, accounts, reckonings, contracts, controversies, agreements, promises and demands based upon negligence, usury, misrepresentation, conspiracy, unconscionability, duress, economic duress, defamation, control, interference with contractual or business relationships, conflicts of interest, misuse of insider information, concealment, disclosure, secrecy, wrongful setoff, violations of statutes and regulations of governmental entities, instrumentalities and agencies, racketeering activities, securities or antitrust laws violations, tying arrangements, deceptive trade practices, breach or abuse of any alleged fiduciary duty, breach or abuse of any alleged duty of care or loyalty, breach of any alleged special relationship, course of conduct or dealing, alleged obligation of fair dealing, alleged obligation of good faith, alleged obligation of good faith and fair dealing, failure to provide notice of, or request consent to, any matter or action whether or not in connection with or related to an agreement, or any doctrine of piercing the corporate veil, alter ego, mere instrumentality or agency.

"Excluded Claim" shall mean (a) any Claim, whenever arising, based on the obligations, liabilities or agreements of any person under this Release, the Consulting Agreement, the Asset Purchase Agreement, or any other agreement, certificate, instrument or document executed and delivered in connection with the Contemplated Transactions (as defined in the Asset Purchase Agreement) or otherwise relating to the Asset Purchase Agreement and (b) any Claim arising after the date hereof, if such Claim is based on any obligations, liabilities or agreements that are created after the date hereof.

"Person" shall mean an individual, sole proprietorship, corporation, partnership, limited partnership, limited liability company, joint venture, trust, statutory trust, unincorporated organization, mutual company, joint stock company, estate, union, employee organization, bank, trust company, land trust or other organization, whether or not a legal entity.

2.      Releases.

(a)     Release by the Selling Parties. The Selling Parties, and each of them, hereby covenant not to sue and hereby fully release and forever discharge the Purchaser its predecessors, successors, subsidiaries, parent companies, divisions, partners, joint ventures, affiliates, and its past, present and future principals, officers, directors, employees, shareholders, members, partners, stockholders, controlling persons or entities, administrators, executors, trustees, attorneys, agents, advisors, representatives and assigns (collectively, the "Purchaser Releasees"), from any and all Claims of any nature whatsoever, regardless of when, by whom and wherever and however asserted, that the Selling Parties, and each of them, ever had, now have or hereafter can, shall or may have, or may claim to have, whether directly or indirectly, or by assignment or succession, against the Purchaser Releasees, or any of them, for, upon, or by reason of any matter, cause or thing; *provided, however*, that nothing provided or contained in this Section 2(a) or in any other provision of this Release shall be construed as or deemed to be a release by the Selling Parties of any Excluded Claims.

(b)     Release by Purchaser. The Purchaser hereby covenants not to sue and hereby fully releases and forever discharges the Selling Parties, and each of them, and each of the

Selling Parties' respective predecessors, successors, subsidiaries, parent companies, divisions, partners, joint ventures, affiliates, and each of their respective past, present and future principals, officers, directors, employees, shareholders, stockholders, controlling persons or entities, members, partners, administrators, executors, trustees, attorneys, agents, advisors, representatives and assigns (collectively, the "Selling Parties' Releasees"), from (a) any and all Claims, whether for principal, interest, penalties, expenses, deficiencies or otherwise, for indebtedness or other obligations arising under the Loan Documents, (b) any and all Claims of any security interest, encumbrance or lien on any of the assets of any of the Selling Parties' Releasees arising under the Loan Documents or the Deed of Trust, and (c) any and all other Claims, of any nature whatsoever, including but not limited to any Claims for Lee's personal liability under the Lee Guaranty, regardless of when, by whom and wherever and however asserted, that the Purchaser ever had, now has or hereafter can, shall or may have, or may claim to have, whether directly or indirectly, or by assignment or succession, against the Selling Parties' Releasees, or any of them, for, upon, or by reason of any matter, cause or thing; *provided, however*, that nothing provided or contained in this Section 2(b) or in any other provision of this Release shall be construed as or deemed to be a release by the Purchaser of any Excluded Claims.

3.      Effective Date. This Release shall become effective upon the date hereof.

4.      Dismissal. Promptly following the date hereof, the Purchaser shall file a motion with the Los Angeles Superior Court seeking to dismiss with prejudice the case of Shinhan Bank v. Harvard Grand Investment, Inc. and Chang Hun Lee, Case No. BC 431824.

5.      California Civil Code 1542. Each party acknowledges that it is aware of and has read Section 1542 of the California Civil Code, which provides as follows:

> "A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor."

Each party acknowledges and understands the rights and benefits conferred by Section 1542 of the California Civil Code and the risks associated with waiver of said Section 1542, and after receiving advice of counsel, hereby consciously and voluntarily waives, relinquishes and releases any and all rights and benefits available under said Section 1542 insofar as they apply, or may be construed to apply, to each release set forth in or contemplated by this Release. In so doing, each party expressly acknowledges and understands that it may hereafter discover facts in addition to or different from those that it now believes to be true with respect to the subject matter of the disputes, claims and other matters released in this Release, but expressly agrees that it has taken these facts and possibilities into account in electing to make and to enter into this Release, and that the releases given herein shall be and remain in effect as full and complete releases notwithstanding the discovery or existence of any such additional or different facts or possibilities.

6.      Enforceability. Each party to this Release represents, warrants and acknowledges that it has had the opportunity to consult with independent counsel regarding the legal effects of this Release, and that it is executing this Release of its own free will and accord, for the purposes and considerations set forth herein. Each party to this Release hereby acknowledges that this Release is binding and enforceable against it in accordance with its terms. Any law or regulation that provides that the language of a contract shall be construed against the drafter shall not apply to this Release.

7.      Authority. Each party to this Release represents, warrants and acknowledges that it has all power and authority to execute and deliver this Release and to grant the releases herein.

8.      Third Party Beneficiaries. The parties to this Release specifically intend that each of the Purchaser Releasees and the Selling Parties' Releasees who are not signatories to this Release shall be and hereby are specifically made third party beneficiaries of this Release. Except for such Purchaser Releasees and the Selling Parties' Releasees who are not signatories to this Release, this Release shall be for the sole benefit of the parties hereto, and is not intended to give nor shall it be construed to give any Person not a party hereto, any legal or equitable right, remedy, or claim hereunder.

9.      No Admissions. Nothing in this Release or any negotiations or proceedings in connection herewith shall constitute or be deemed or claimed to be evidence of an admission by any party of any liability, violation of law, or wrongdoing whatsoever, or the truth or untruth, or merit or lack of merit, of any claim or defense of any party. Neither this Release nor any negotiations or proceedings in connection herewith may be used in any proceeding against any party for any purpose whatsoever except with respect to effectuation and enforcement of this Release.

10.     Governing Law. THIS RELEASE SHALL BE GOVERNED BY, AND INTERPRETED AND CONSTRUED UNDER, THE LAWS OF THE STATE OF CALIFORNIA, WITHOUT GIVING EFFECT TO ITS CHOICE OF LAW PRINCIPLES.

11.     Counterparts; Facsimile. This Release may be executed in multiple counterparts, each of which shall constitute one and the same instrument; and the manual signature of any party hereto that is transmitted to any other party or its counsel by facsimile shall be deemed for all purposes to be an original signature.

12.     Interpretation. The headings, captions and arrangements used in this Release are for convenience only and shall not affect the interpretation of this Release. Words in the singular include the plural and words in the plural include the singular. In case any one or more of the provisions contained in this Release shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provisions hereof, and this Release shall be construed as if such invalid, illegal, or unenforceable provision had never been contained herein.

13.     Amendments. This Release may not be modified orally, but only by an agreement in writing signed by each of the parties hereto. Any provision of this Release can be waived, amended, supplemented or modified by written agreement of the parties hereto.

14.     Binding Effect; Assignment. This Release may not be assigned by any party without the written consent of the other parties and any attempted assignment will be null and void. This Release will be binding upon each of the parties and their respective heirs, successors, permitted assigns, and legal representatives, and will inure to the benefit of each of the parties to this Release and their respective heirs, successors, permitted assigns, and legal representatives.

15.     Further Assurances. Each Party hereto will execute, acknowledge and deliver any further assurance, documents and instruments reasonably requested by any other Party for the purpose of giving effect to the intentions of the Parties expressed herein.

16.     Entire Agreement. This Release constitutes the entire agreement and understanding of the parties hereto with respect to the subject matter hereof, and supersedes all prior understandings, written or oral, with respect to the subject matter hereof. The terms of this Release may not be changed, modified or discharged in any manner whatsoever except by an instrument in writing signed by all of the parties hereto. A failure of any party to insist on strict compliance with any provision of this Release shall not be deemed a waiver of such provision or any other provision hereof. Each of the parties

acknowledges that no party has relied upon any representations from the other parties except as specifically provided in this Release.

*[Remainder of this page intentionally left blank.  Signature pages follow.]*

IN WITNESS WHEREOF, the undersigned have executed this Release as of the date first above written.

**PURCHASER:**

**CARSON HOTEL, LLC,**
a Delaware limited liability company

By: _____

Its: _____

**SELLER:**

**HARVARD GRAND INVESTMENT, INC.**
a California corporation,
Chapter 11 debtor and debtor in possession

By: _____

Its: _____

**PRINCIPAL:**

Chang Hun (James) Lee

_____

**Exhibit "G"**

## INTERIM ALCOHOL BEVERAGE AGREEMENT

This "INTERIM ALCOHOLIC BEVERAGE AGREEMENT" is made, effective as of **, among
** ("Licensee"), **. ("Manager") and ** (Owner").

The purpose of this Agreement is to clarify the rights and obligations of the parties with respect to
responsibility for the operation of the alcoholic beverage business (the "Business") at the ** Hotel (the
"Hotel"), pending transfer of the alcoholic beverage license (the "License") and alcoholic beverage
inventory at the Hotel ( "Inventory") from Licensee to a third party.

1.      Licensee agrees to transfer the License to the third party specified by Owner, and Owner
agrees to cause the third party to file for transfer of the License as soon as reasonably possible.  In
addition, upon issuance of the temporary alcoholic beverage permit, Licensee shall transfer the Inventory
to the third party.  Licensee agrees to cooperate in the transfer of the License, the opening of the escrow
and the completion of all necessary paperwork.  Owner agrees to pay or arrange for payment of all
escrow, application and transfer fees.

2.      Pending the issuance of the temporary alcoholic beverage permit, Licensee shall be
responsible for the operation of the Business at the Hotel, and Owner hereby grants Licensee the right to
enter onto the Hotel premises and to use such of the Hotel properties as may be necessary for that
purpose.   Until such time as the temporary permit is issued and effective, Manager shall operate the
Business as the manager thereof on behalf of Licensee and shall assure compliance with all laws
pertaining to the operation of the Business.  Owner hereby consents to Manager's operation of the
Business on behalf of and pursuant to the direction and control of Licensee.

3.      Title to the Inventory shall remain in Licensee until the temporary permit is issued and
effective.  Until such time, all proceeds from the operation of the Business at the Hotel shall be applied to
the operating expenses of the Business.

4.      Manager and Owner agree to indemnify Licensee against any and all loss, cost, liability
and expense (including attorneys fees) that may arise from Manager's management of the Business;
provided, however, such indemnity shall not apply to any matter that relates to an event that occurred
prior to the date hereof, or that arose due to Licensee's negligence or willful misconduct..  Manager and
Owner agree to provide all customary insurance coverages at the Hotel and to name Licensee as an
additional insured on such policies for the term of this Agreement.

5.      Licensee and Manager shall not be construed as partners, joint venturers or as having an
employer or employee relationship, and nothing contained herein shall be construed to the contrary.

6.      This agreement may be executed in counterparts, each of which shall be deemed an
original, but all of which, together, shall constitute one and the same instrument, binding on the parties
hereto.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date stated above.

(Licensee)


By _____        By: _____

(Owner)                                     (Manager)


By _____        By _____

Schedule 2.1

| | |
|---|---:|
| Scheduled Priority Claims | $250,894.17 |
| Scheduled General Unsecured Claims | 416,135.51 |
| Subtotal | 667,029.68 |
| Less Hilton Scheduled Claim | 182,096.74 |
| Subtotal | 494,932.94 |
| Plus $50,000 | 534,932.94 |

Schedule 2.2

| | | |
|---|---|---|
| Payroll  Expenses | $ 57,000.00 | (plus amounts incurred after June 23, 2010) |
| Accrued Vacation | 30,000.00 | (plus amounts incurred after June 23, 2010) |
| Accounts Payable | 193,000.00 | (plus amounts incurred after June 17, 2010) |
| Sales and Use Taxes | 28,308.85 | (plus amounts incurred after June 17, 2010) |
| Occupancy Tax | 16,322.31 | (plus amounts incurred after June 17, 2010) |

| 1 | In re HARVARD GRAND INVESTMENT, INC. | CHAPTER  11 |
| 2 | Debtor(s). | CASE NO 2:10-bk-31833-BR |

## PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is: 10250 Constellation Blvd., Ste. 1700, Los Angeles, CA  90067

A true and correct copy of the foregoing document described as **NOTICE OF SUBMISSION OF ASSET PURCHASE AGREEMENT RE: MOTION FOR ENTRY OF AN ORDER: (A) APPROVING COMPROMISE OF CONTROVERSY BETWEEN DEBTOR AND SECURED CREDITOR; (B) AUTHORIZING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS; (C) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (D) GRANTING RELATED RELIEF**  will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

I.   **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On **June 21, 2010** I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

    * Russell Clementson    russell.clementson@usdoj.gov
    * Jeffrey W Dulberg     jdulberg@pszjlaw.com
    * David B Golubchik     dbg@lnbrb.com
    * Juliet Y Oh     jyo@lnbrb.com, jyo@lnbrb.com
    * Penelope Parmes     pparmes@rutan.com
    * United States Trustee (LA)     ustpregion16.la.ecf@usdoj.gov
    * Michael R Williams     mwilliams@fwtrl.com, wmills@fwtrl.com

☐  Service information continued on attached page

II.  **SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served)**:**
On **June 21, 2010** I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

None.                                    ☐  Service information continued on attached page

(PROOF OF SERVICE CONTINUED ON FOLLOWING PAGE)

1
2
3
4

**III. SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **June 21, 2010** I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.

**VIA ATTORNEY MESSENGER DELIVERY**
Hon. Barry Russell
U.S. Bankruptcy Court
255 E. Temple Street, Ctrm 1668
Los Angeles, CA  90012          ☐   Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct

| June 21, 2010 | Angela Antonio | /s/ Angela Antonio |
|---|---|---|
| Date | Type Name | Signature |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*January 2009*   **F**                                                                 **9013-3.1**

5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

2